ACCEPTED
011500387-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/27/2015 1:55:40 PM
CHRISTOPHER PRINE
CLERK

## No. 01-15-00387-CV

IN THE COURT OF APPEALS
FIRST JUDICIAL DISTRICT
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/27/2015 1:55:40 PM
CHRISTOPHER A. PRINE
Clerk

IFEOLUMIPO O. SOFOLA, M.D.

*APPELLANT*

VS.

AETNA HEALTH, INC. AND
AETNA LIFE INSURANCE COMPANY

*APPELLEES*

ON INTERLOCUTORY APPEAL FROM THE 152ND JUDICIAL
DISTRICT COURT OF HARRIS COUNTY, TEXAS
TRIAL COURT CASE NO. 2013-76814

APPELLANT'S BRIEF

BENJAMIN L. HALL, III
STATE BAR NO. 08743745
WILLIAM L. VAN FLEET II
STATE BAR NO. 20494750
530 LOVETT BOULEVARD
HOUSTON, TX 77006
(713) 942-9600 (TELEPHONE)
(713) 942-9566 (FACSIMILE)
bvfleet@comcast.net

ORAL ARGUMENT REQUESTED

ATTORNEYS FOR APPELLANT

i

## PARTIES AND COUNSEL

The identities of all parties to this appeal, together with their counsel, are:

APPELLANT

Ifeolumipo O. Sofola, M.D.

APPELLANTS' COUNSEL

The Hall Law Firm
Benjamin L. Hall III
William L. Van Fleet II
530 Lovett Boulevard
Houston, Texas 77006
(713) 942-9600 (Telephone)
(713) 942-9566 (Facsimile)

APPELLEES

Aetna Health, Inc. and Aetna Life Insurance Company

APPELLEES' COUNSEL

Andrews Kurth, LLP
John B. Shely
Dena Palermo
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4200 (Telephone)
(713) 220-4285 (Facsimile)

# TABLE OF CONTENTS

PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      POINT OF ERROR 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      POINT OF ERROR 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## INDEX OF AUTHORITIES

FEDERAL OPINIONS

*Gen. Guar. Ins. Co. v. New Orleans Gen. Agency, Inc.*, 427 F.2d 924 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16-18

*Long v. BDP International, Inc.*, 919 F.Supp.3d 832 (S.D. Tex. 2013) . . 18

TEXAS OPINIONS

*EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87 (Tex. 1996) . . . . . . . . . . . . . . 14

*G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, ___ S.W.3d ___ (Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-17, 19, 21

*IBS Asset Liquidations LLC v. Servicios Multiples Del Norte SA De CV*, 419 S.W.3d 573 (Tex.App.—San Antonio 2013, pet. denied) . . . . 13, 16, 21-22

*In re D. Wilson Const. Co.*, 196 S.W.3d 774 (Tex. 2006) . . . . . . . . .10, 14,19

*In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692 (Tex. 2008) . . 11, 16

*In re Medallion, Ltd.*, 70 S.W.3d 284 (Tex.App.—San Antonio 2002, orig. proceeding) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571 (Tex.1999) . . . . . . .10

*In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759 (Tex.2006) . . . . . . . . . 13, 16

*Pennzoil Co. v. Arnold Oil Co., Inc.*, 30 S.W.3d 494 (Tex.App.—San Antonio 2000, orig. proceeding) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Perry Homes v. Cull*, 258 S.W.3d 580 (Tex. 2008) . . . . . . . . . . . 13-15, 20

*Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, ___ S.W.3d ___ (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 21

*Williams Indus., Inc. v. Earth Dev. Sys. Corp.,* 110 S.W.3d 131 (Tex.App.—Houston [1st Dist.] 2003, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . .21

FEDERAL STATUTES

9 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

9 U.S.C. §16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

9 U.S.C. § 16(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

9 U.S.C. § 16(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

TEXAS STATUTES

Tex. Civ. Prac. & Rem. Code Ann. § 51.016 . . . . . . . . . . . . . . . . . . 2-3

TEXAS RULES OF PROCEDURE

Tex.R.App.P. 26.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Tex.R.App.P. 28.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Tex.R.Civ.P. 97(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

No. 01-15-00387-CV

---

In the Court of Appeals
First Judicial District
Houston, Texas

---

Ifeolumipo O. Sofola, M.D.

APPELLANT

vs.

Aetna Health, Inc. and
Aetna Life Insurance Company

APPELLEES

---

On Interlocutory Appeal From the 152ND Judicial
District Court of Harris County, Texas
Trial Court Case No. 2013-76814

---

Appellant's Brief

---

To the Honorable Court of Appeals:

STATEMENT OF THE CASE

This interlocutory appeal arises from an Order (the "Arbitration Denial

Order") signed on April 6, 2015, by the Honorable Robert K. Schaffer,

presiding judge of the 152nd Judicial District Court of Harris County, Texas,

1

denying Ifeolumipo O. Sofola, M.D.'s ("Dr. Sofola") Corrected Amended Motion for Contractual Severance of Claims and for Arbitration (the "Corrected Motion"). (CR 231; 253)[1] The Corrected Motion further requested that all trial court proceedings be stayed pending arbitration, which the trial court also denied. *Id.*

At the heart of this interlocutory appeal is a March 1, 2009 Specialist Physician Agreement (the "SPA") by and between Dr. Sofola and Appellee Aetna Health, Inc. "and its Affiliates" which include Appellee Aetna Life Insurance Company (both entities shall be collectively referred to as "Aetna"). (CR 129-56)[2] Because the SPA arbitration provision specifies the application of the Federal Arbitration Act (the "FAA"), this Court possesses jurisdiction over this appeal pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 51.016, which authorizes appeals from any orders entered in actions subject to the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) that are appealable under 9 U.S.C. §16. In turn, 9 U.S.C. § 16(a)(1)(A) and (C) authorize appeals from orders which either deny stays pending arbitration or deny requests to compel parties to arbitrate.

---

[1] References to the Clerk's Record in this Brief are abbreviated as "CR ___." References to the Reporter's Record are abbreviated as "RR ___."
[2] Both entities are plaintiffs in the trial court.

2

Dr. Sofola timely filed his Notice of Appeal (Interlocutory) on April 21, 2015 (CR 256), within 20 days of the date of the Arbitration Denial Order in compliance with Tex.R.App.P. 26.1(b). Because this is an appeal from an interlocutory order permitted by Tex. Civ. Prac. & Rem. Code Ann. § 51.016, this is an accelerated appeal pursuant to Tex.R.App.P. 28.1(a).

## STATEMENT REGARDING ORAL ARGUMENT

Because resolution of this appeal is governed by a "totality of the circumstances" standard, Dr. Sofola believes that oral arguments would assist the Court in reviewing and understanding the actions taken by Dr. Sofola in the underlying trial court litigation. Dr. Sofola thus requests that the Court permit oral arguments in this appeal.

## ISSUES PRESENTED

Point of Error 1: The trial court erred in entering the Arbitration Denial Order to the extent the court concluded that Dr. Sofola expressly waived his right to arbitration and severance.

Point of Error 2: The trial court erred in entering the Arbitration Denial Order to the extent the court concluded that Dr. Sofola impliedly waived his right to arbitration and severance because (a) Dr. Sofola did not substantially invoke the litigation process, and (b) Aetna did not

3

demonstrate that it has been prejudiced by Dr. Sofola's actions or inactions in the trial court proceedings.

## STATEMENT OF FACTS

On March 1, 2009, Dr. Sofola and Aetna executed the SPA central to this appeal. (CR 129-56) Pursuant to Section 8.3 of the SPA, Dr. Sofola and Aetna expressly agreed to arbitrate any controversy or claim arising from the SPA with the sole exception of claims for equitable relief. The parties further agreed that any such arbitration would be governed by the FAA, as well as to preclude the taking of any depositions in connection with the arbitration proceedings. (CR 147)

Moreover, in Section 8.4 of the SPA Dr. Sofola and Aetna further agreed that any such arbitration proceedings "shall be conducted solely between them," and that no other party or proceeding could be joined or consolidated with the arbitration proceedings. (CR 147)

On December 26, 2013, Aetna filed its Original Petition against Dr. Sofola, his company Starlight Surgical, PLLC ("Starlight"), Michael L. Blackwell, M.D. ("Dr. Blackwell") and Dr. Blackwell's company, Batjac Surgical Group, PLLC ("Batjac") alleging equitable claims for "money had and received" as well as an injunction and an equitable accounting. (CR 5)

4

Each of the claims against Dr. Sofola and Dr. Blackwell was predicated upon the SPAs executed by each of them.

On January 31, 2014, all defendants jointly filed a Plea to the Jurisdiction, Special Exception and Answer which specifically raised the arbitration provisions in the SPAs. (CR 15, 24) And in its response to this Plea, Aetna expressly acknowledged that it was suing under its SPAs. (CR 26) In reply to Aetna's response, the defendants once again referred to the arbitrability of the SPAs. (CR 33, 38)

On March 25, 2014, the trial court entered an order sustaining the defendants' Plea to the Jurisdiction with respect to all claims asserted by Aetna save and except for its request for an equitable accounting. (CR 56)

Months later, all defendants filed another motion for summary judgment with respect to Aetna's remaining claim for an equitable accounting (CR 57) to which Aetna filed a response (CR 171), but the motion was never set and never ruled upon by the trial court.

On November 7, 2014, Aetna filed its First Amended Petition in which for the first time it expressly pleaded breach of the SPAs by Dr. Sofola and Dr. Blackwell, as well as fraud, conspiracy, money had and received and unjust enrichment, seeking both monetary and equitable relief. (CR 64).

Accordingly, on January 6, 2015, the defendants filed their first Motion to Dismiss for Mandatory Arbitration and for Stay (the "Initial Arbitration Motion") requesting that the trial court compel arbitration of Aetna's claims. (CR 179) Approximately two weeks later, Aetna filed its response to the Initial Arbitration Motion. (CR 200) Significantly, in its response Aetna (a) expressly agreed to submit all its claims, both legal and equitable, against both Dr. Sofola and Dr. Blackwell to arbitration (CR 200 at Paragraph 2), and (b) expressly agreed that the trial court should order Aetna to arbitrate its claims against both Dr. Sofola and Dr. Blackwell. (CR 200, 203).

On February 17, 2015, the defendants filed a Notice of Withdrawal of Motion to Dismiss for Mandatory Arbitration and for Stay (the "Notice of Withdrawal"). (CR 205) Of particular relevance in this appeal, the second paragraph of the Notice of Withdrawal states: "The withdrawal of this motion is consistent with counsel's advice and Defendants' instructions to counsel *and is without prejudice. Defendants reserve the right to re-file a Motion to Dismiss in the future, if necessary.*" (Emphasis added)

Two days later, the parties filed an Agreed Motion to Extend Docket Control Order Deadlines (CR 207) which the Court granted on March 6, 2015. (CR 211)

6

On March 13, 2015, Dr. Sofola filed a counterclaim against Aetna. (CR 212) The counterclaim stated in bold type that it was "expressly and unconditionally subject to and insisting upon compliance with the arbitration provision between the parties." Dr. Sofola never moved for summary disposition of his counterclaim, and the trial court has thus never acted upon it.

Three days later, Dr. Sofola filed a Motion for Contractual Severance of Claims and for Arbitration pursuant to Sections 8.3 and 8.4 of his SPA with Aetna. (CR 220) Dr. Sofola thereafter filed a First Supplement to this motion (CR 223), an Amended Motion for Contractual Severance of Claims and for Arbitration (CR 225), and a Corrected Amended Motion for Contractual Severance of Claims and for Arbitration (CR 231) Each of these motions requested the trial court to compel arbitration of the claims asserted by Dr. Sofola and Aetna against each other, and to sever those claims from those asserted by Aetna against all of the other defendants.

On March 26, 2015, Aetna filed its Response to Defendant Sofola's Amended Motion for Contractual Severance of Claims and for Arbitration. (CR 241) In its response, Aetna argued that (a) Dr. Sofola had implicitly waived his right to severance pursuant to Section 8.4 of the SPA by failing to raise it in prior pleadings, (b) Dr. Sofola had expressly waived his right to

7

arbitration by his counsel's allegedly advising Aetna of their intent to no longer seek arbitration, followed the next day by the filing of the Notice of Withdrawal, and (c) Dr. Sofola implicitly waived his right to arbitration by substantially invoking the litigation process. Aetna, however, did not even suggest, much less offer any proof, that it had in any way been prejudiced by Dr. Sofola's actions or inactions with respect to his rights to arbitration and severance under the SPA.

The trial court conducted an oral hearing on Dr. Sofola's arbitration motions on March 30, 2015. (RR Vol. 2) No evidence was presented during this hearing, and as to any prejudice suffered by Aetna its counsel merely stated that it responded to some motions filed by the defendants and amended its pleadings in the case, concluding with the statement "we've got a lot of money invested in this case" with no quantification. (RR Vol. 2, p. 12-14)

On April 6, 2015, the trial court signed the Arbitration Denial Order from which this appeal arises. (CR 253) The order does not specify the basis for denying Dr. Sofola's Corrected Motion requesting arbitration and severance. Dr. Sofola thereafter timely filed his notice of appeal from the order on April 21, 2015. (CR 256)

Throughout the proceedings in the trial court below, neither Dr. Sofola nor any of the other defendants served any written discovery requests upon Aetna or took any depositions. Only Aetna engaged in any discovery, and that limited solely to one set of written discovery requests served in late March 2015, to which the defendants responded on April 28, 2015. (CR 264)

Trial in the court below is presently scheduled for February 1, 2016. (CR 237)

## SUMMARY OF THE ARGUMENT

Dr. Sofola did not expressly and unequivocally waive his right to arbitration and severance because the Notice of Withdrawal specifically stated that the defendants' withdrawal of their pending Initial Arbitration Motion was without prejudice, and reserved the right to refile an arbitration motion in the future.

Under the totality of the circumstances in this case, Dr. Sofola did not substantially invoke the litigation process and, thus, did not impliedly waive his rights to arbitration and severance.

Finally, there is no evidence in the record demonstrating that Aetna suffered any prejudice arising from Dr. Sofola's actions or inaction in the trial court proceedings.

9

**I. Point of Error 1: The trial court erred in entering the Arbitration Denial Order to the extent the court concluded that Dr. Sofola expressly waived his right to arbitration and severance.**

At the threshold, the Court should note that Aetna has never contended that Section 8.3 of the SPA does not constitute a valid agreement to submit their disputes relating to the SPA to arbitration. And although that section carves out claims for equitable relief from arbitration, nevertheless Aetna specifically agreed to submit its equity claims to arbitration in the second paragraph of its response to the Initial Arbitration Motion. (CR 200) Thus, unless Dr. Sofola expressly or impliedly waived his rights to arbitration and severance, Aetna's claims against him should be referred to arbitration. *See, e.g., In re D. Wilson Const. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (noting that claims should be referred to arbitration if a valid arbitration agreement exists, and the claims brought in litigation are encompassed by that agreement); *citing In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex.1999) (per curiam).

In the trial court, Aetna initially argued that Dr. Sofola expressly waived his right to arbitration by (a) filing the Notice of Withdrawal on February 17, 2015, and (b) agreeing to a Motion to Extend Docket Control

10

Deadlines filed two days later which stated at the conclusion of its third paragraph that "On February 16, 2015, Defendants notified Aetna that Defendants intended to withdraw their [Initial Arbitration Motion] and would no longer request that the Court compel arbitration." (CR 207, 208) Neither of these documents constitute an unequivocal repudiation of Dr. Sofola's right to arbitrate.

As the Texas Supreme Court recently held in *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, ___ S.W.3d ___ at *6 (Tex. 2015), express waiver requires proof that the party moving for arbitration "expressly relinquish[ed] and repudiate[d] a right to arbitration." Citing similar facts it addressed in *In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692 (Tex. 2008), the Court held that statements made by G.T. Leach (the party moving for arbitration) in a motion for continuance of the trial setting in the underlying litigation that "there is insufficient time for the parties to prepare this case with the current trial setting" and discovery "cannot be completed prior to the current trial setting," taken together with G.T. Leach's subsequent Rule 11 agreement with all parties in which a new docket schedule and trial date were agreed upon, were insufficient to constitute an express waiver of G.T. Leach's right to arbitration.

11

In this case, the Notice of Withdrawal specifically stated that the defendants' withdrawal of their Initial Arbitration Motion was *"without prejudice,"* and that *"Defendants reserve the right to re-file a Motion to Dismiss in the future, if necessary."* (Emphasis added) And the conversation between counsel referenced in the second paragraph of the Motion to Extend Docket Control Deadlines occurred the day *before* the Notice of Withdrawal was actually filed. That conversation plainly referred to the defendants' intention to file the Notice of Withdrawal.

Rather than "expressly relinquish[ing] and repudiate[ing] a right to arbitration," the Notice of Withdrawal plainly reserved Dr. Sofola's and the other defendants' right to urge referral to arbitration in a future motion. Neither the Notice of Withdrawal nor the conversation between counsel the day preceding its filing thus satisfy the requirements of an express waiver of the right to arbitration. *G.T. Leach* at *6.

**II. The trial court erred in entering the Arbitration Denial Order to the extent the court concluded that Dr. Sofola impliedly waived his right to arbitration and severance because (a) Dr. Sofola did not substantially invoke the litigation process, and (b) Aetna did not demonstrate that it has been prejudiced by Dr. Sofola's actions or inactions in the trial court proceedings.**

12

It is, of course, well settled that a party may impliedly waive its right to compel arbitration by substantially invoking the litigation process to the detriment or prejudice of the other party. *Perry Homes v. Cull*, 258 S.W.3d 580, 589-90 (Tex. 2008); *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex.2006). But "[d]ue to the strong presumption against waiver of arbitration, this hurdle is a high one." *Perry Homes*, 258 S.W.3d at 590; *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, ___ S.W.3d ___ at *1-2 (Tex. 2014) (per curiam)  Thus, to demonstrate implied waiver of the right to arbitration the non-moving party must prove *both* "(1) the other party has 'substantially invoked the judicial process,' which is conduct inconsistent with a claimed right to compel arbitration, and (2) the inconsistent conduct has caused it to suffer detriment or prejudice." *G.T. Leach*, ___ S.W.3d ___ at *6.

Whether a party has impliedly waived arbitration is a question of law, *In re Medallion, Ltd.*, 70 S.W.3d 284, 288 (Tex.App.—San Antonio 2002, orig. proceeding), and appellate courts review findings of waiver *de novo*, giving no deference to the trial court's ruling. *Perry Homes*, 258 S.W.3d at 598; *IBS Asset Liquidations LLC v. Servicios Multiples Del Norte SA De CV*, 419 S.W.3d 573, 575 (Tex.App.—San Antonio 2013, pet. denied).  Finally, "in close cases, the 'strong presumption against waiver'

13

should govern." *Perry Homes*, 258 S.W.3d at 597; *citing In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783 (Tex.2006); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89 (Tex. 1996).

In *G.T. Leach* the Texas Supreme Court observed that whether a party has waived its right to compel arbitration "depends on the totality of the circumstances," and set out a list of factors to be considered by courts in making that determination:

(1) how long the party moving to compel arbitration waited to do so;

(2) the reasons for the movant's delay;

(3) whether and when the movant knew of the arbitration agreement during the period of delay;

(4) how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits;

(5) whether the movant requested the court to dispose of claims on the merits;

(6) whether the movant asserted affirmative claims for relief in court;

(7) the extent of the movant's engagement in pretrial matters related to the merits (as opposed to matters related to arbitrability or jurisdiction);

14

(8) the amount of time and expense the parties have committed to the litigation;

(9) whether the discovery conducted would be unavailable or useful in arbitration;

(10) whether activity in court would be duplicated in arbitration; and

(11) when the case was to be tried.

*G.T. Leach,* ___ S.W.3d at \*6-7; *citing Perry Homes,* 258 S.W.3d at 590–91.

Applying the *G.T. Leach* factors in turn to the facts before this Court, while it is true that Dr. Sofola and the other defendants did not initially move to compel arbitration until 13 months after suit was filed by Aetna, they could not do so until after Aetna filed its First Amended Petition on November 7, 2014, which for the first time brought Aetna's claims squarely within the arbitration provisions of Section 8.3 of the SPA by alleging breach of the SPA and other claims for monetary damages. Prior to that point in time, as the defendants pointed out in both their Plea to the Jurisdiction, Special Exception and Answer as well as their Motion for Summary Judgment regarding Aetna's claim for equitable accounting, Aetna had artfully pleaded around the arbitration provision by alleging only equitable claims which were excepted from the arbitration provision. Dr.

15

Sofola and the other defendants filed their Initial Arbitration Motion within 60 days of Aetna's filing of its First Amended Petition which plainly triggered Section 8.3 of the SPA. A mere 60-day delay clearly does not constitute the dilatoriness required by courts to support implied waiver. *See, e.g., In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692 (Tex. 2008) (holding that 8-month delay in filing motion to compel arbitration insufficient to waive right to arbitration); *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759 (Tex.2006) (2-year delay); *IBS Asset Liquidations LLC v. Servicios Multiples Del Norte SA De CV*, 419 S.W.3d 573 (Tex.App.—San Antonio 2013, pet. denied) (2-1/2 year delay).

As stated previously, neither Dr. Sofola nor the other defendants served any written discovery or noticed any depositions in the litigation. In fact, the *only* discovery undertaken in the lawsuit was a recent set of written discovery served by Aetna to which the defendants responded in late April 2015. Significantly, no depositions have been noticed or taken in the litigation—a form of discovery expressly prohibited by Section 8.3 of the SPA. Thus, the lack of any discovery served by Dr. Sofola militates against finding any waiver of his arbitration rights. *See G.T. Leach*, ___ S.W.3d at *10 ("Responding to discovery and simply being named in the lawsuit while discovery is ongoing do not amount to waiver."); *Keytrade USA, Inc. v. Ain*

16

*Temouchent M/V*, 404 F.3d 891, 898 (5th Cir. 2005) (holding that "a party may participate in the discovery process so long as it does not 'shower[] [the opposing party] with interrogatories and discovery requests'").

Although Dr. Sofola and the other defendants initially responded to Aetna's Original Petition with a Plea to the Jurisdiction (CR 15), the gist of the Plea argued that Aetna had no standing to obtain the equitable relief it demanded, not the underlying merits of Aetna's factual allegations supporting those claims or the arbitrability of the claims. Indeed, the Plea initially argues that Aetna's petition "attempts to plead around [the arbitration provision of the SPA] while invoking Texas statues it has no standing to enforce."

Seven months after the trial court granted the Plea to the Jurisdiction in part, Dr. Sofola and the other defendants moved for summary judgment on Aetna's then-sole remaining claim for an equitable accounting. (CR 57) But in that motion Dr. Sofola and the other defendants once again contended that the SPAs' arbitration provisions provided Aetna with an adequate remedy at law, thus precluding the equitable remedy of an accounting. (CR 61-62) The trial court never ruled on this motion.

As the Texas Supreme Court held in *G.T. Leach*, "A party's litigation conduct aimed at defending itself and minimizing its litigation expenses,

17

rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process." ___ S.W.3d at *9. Indeed, as the Court noted, the federal Fifth Circuit Court of Appeals has previously determined that even filing motions for summary judgment "from a defensive posture" alone is insufficient to amount to an implied waiver of arbitration under the FAA. *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 898 (5th Cir. 2005) (holding that defendant's 100-page motion for summary judgment from a defensive standpoint did not constitute a waiver of arbitration rights, particularly in view of defendant's alternative request for arbitration). *See also, Gen. Guar. Ins. Co. v. New Orleans Gen. Agency, Inc., 427 F.2d 924 (5th Cir. 1970)* (finding no waiver where party seeking arbitration filed a motion for summary judgment, motion to dismiss, and a counterclaim, and had attempted to implead third persons, and where opposing party had taken depositions); *Long v. BDP International, Inc.*, 919 F.Supp.3d 832, 848 (S.D. Tex. 2013) (holding that defendant did not waive arbitration by filing motion for summary judgment two days prior to filing motion to compel arbitration).

Both the Plea to the Jurisdiction and the motion for summary judgment in this case were filed from a purely defensive standpoint, and both expressly raised the arbitration provisions of the SPAs. Thus, the

18

Plea and the motion do not, either taken alone or together with Dr. Sofola's other litigation conduct (or lack thereof), support a finding that he waived his right to arbitrate.

And although Dr. Sofola filed a counterclaim against Aetna on March 13, 2015, the counterclaim expressly stated that was subject to Dr. Sofola's right to arbitration and severability under Sections 8.3 and 8.4 of his SPA with Aetna. (CR 212) Dr. Sofola never took any further litigation action with respect to the counterclaim, and three days after its filing Dr. Sofola once again moved to compel arbitration and severance of his claims pursuant to his (and the other defendants') specific reservation of his right to do so in the Notice of Withdrawal.

Dr. Sofola's counterclaim was compulsory pursuant to Tex.R.Civ.P. 97(a) and, thus, Dr. Sofola was required to file it or risking losing his claim against Aetna altogether. *See G.T. Leach*, ___ S.W.3d at *8 (holding that defendant's filing of compulsory counterclaim did not impliedly waive right to arbitration); *citing In re D. Wilson Const. Co.*, 196 S.W.3d 774, 783 (Tex. 2006) (holding that filing cross-actions does not waive right to arbitration). Accordingly, Dr. Sofola's filing of a compulsory counterclaim a mere three days prior to renewing his demand for arbitration and severance did not amount to a waiver of those rights.

19

As more fully discussed *infra*, other than the conclusory comment by Aetna's counsel during the oral hearing on Dr. Sofola's Corrected Arbitration Motion that ""we've got a lot of money invested in this case," (RR Vol. 2, p. 12-14), nothing in the record before this Court gives any indication whatsoever the time or expense the parties have spent in the underlying litigation. And trial of the case is not scheduled until February of next year. *Compare Perry Homes*, 258 S.W.3d at 596-597 (reversing trial court's referral to arbitration when, among other things, plaintiffs had previously opposed arbitration, engaged in 14 months of litigation discovery directed at the merits, but then moved for arbitration just days before the scheduled trial date).

In sum, under the totality of the circumstances by which waiver is measured, no actions (or in action) taken by Dr. Sofola in the litigation proceedings were sufficient to imply any waiver of his rights to arbitration and severance under Sections 8.3 and 8.4, particularly in view of the strong presumption in favor of arbitration. Indeed, Dr. Sofola and the other defendants were assiduous in preserving their arbitration rights in just about every pleading they filed. To the extent that the trial judge premised his Arbitration Denial Order on implied waiver, he clearly committed reversible error.

But even if Dr. Sofola's conduct in the litigation could conceivably be construed to have constituted a waiver of his rights to arbitration and waiver, Aetna wholly failed to prove any detriment or prejudice it allegedly suffered.

As noted previously, the burden is on the party resisting arbitration under a waiver theory to prove *both* substantial invocation of the litigation process *and* that such invocation resulted in detriment or prejudice to the resisting party. *G.T. Leach*, ___ S.W.3d ___ at *6; *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, ___ S.W.3d ___ at *4 (Tex. 2014).

Generally, the burden to demonstrate the requisite detriment or prejudice is an evidentiary one. *IBS Asset*, 419 S.W.3d at 575; *citing Williams Indus., Inc. v. Earth Dev. Sys. Corp.*, 110 S.W.3d 131, 135 (Tex.App.—Houston [1st Dist.] 2003, no pet.). "Generalized complaints about delay and expense, without evidentiary support, are insufficient to establish prejudice." *IBS Asset*, 419 S.W.3d at 575; *citing Pennzoil Co. v. Arnold Oil Co., Inc.*, 30 S.W.3d 494, 499 (Tex.App.—San Antonio 2000, orig. proceeding), and *Williams Indus.*, 110 S.W.3d at 135.

In its response to Dr. Sofola's Corrected Arbitration Motion, Aetna neither asserted any prejudice it had suffered, nor did it offer any affidavit detailing even generally the time and expense it had incurred in connection

21

with the litigation. Nor did Aetna offer any such evidence during the trial court's oral hearing on Dr. Sofola's Corrected Arbitration, contenting itself instead with the "generalized complaint" that "we've got a lot of money invested in this case." Because it failed to produce any evidence of the fees and expenses it incurred in the litigation due to Dr. Sofola's conduct or inaction in the litigation, Aetna failed to prove the second prong of the waiver analysis. *See IBS Asset*, 419 S.W.3d at 575 (holding that even though party moving for arbitration had substantially invoked litigation process, resisting party's mere allegation that it had "invested a significant amount of time and expense into litigating this case over the past 2 1/2 years . . . [and] has incurred significant attorney's fees and costs associated with litigation preparation" without offering any evidence of that time and expense did not satisfy resisting party's burden to prove detriment or prejudice, and thus reversing trial court's denial of motion to compel arbitration).

## CONCLUSION

Dr. Sofola did not expressly waive his right to arbitration because the Notice of Withdrawal clearly and explicitly reserved his and the other defendants' right to refile a motion to compel arbitration in the future.

22

Nor under the totality of the circumstances did Dr. Sofola's conduct in the litigation amount to an implied waiver of his rights to arbitration and severance. Both his Plea to the Jurisdiction and his motion for summary judgment argued Aetna's standing and right to seek equitable relief, rather than the merits of Aetna's claims, and both specifically raised the SPAs' arbitration provisions. None of the defendants served any discovery at all upon Aetna, and all of the defendants moved to compel arbitration within 60 days of the date Aetna amended its petition to allege claims for legal, rather than limited equitable, relief thus clearly triggering the arbitration provisions under the SPAs. Finally, Aetna wholly failed to offer a shred of evidence proving that it had been prejudiced by any of Dr. Sofola's conduct or inaction during the litigation.

Accordingly, this Court should *REVERSE* the trial court's Arbitration Denial Order and *REMAND* this case to the trial court with instructions to sever all of Aetna's claims against Dr. Sofola from the claims it has asserted against all other defendants, and to compel arbitration of those severed claims.

SIGNED AND FILED this 27th day of May, 2015.

23

Respectfully submitted,

*THE HALL LAW FIRM*

/s/William L. Van Fleet
Benjamin L. Hall III
Texas Bar No. 08743745
William L. Van Fleet II
Texas Bar No. 20494750
Kimmie R. Bennett
State Bar No. 24011946
530 Lovett Blvd.
Houston, TX 77006
(713) 942-9600 (Telephone)
(713) 942-9566 (Facsimile)
bvfleet@comcast.net

ATTORNEYS FOR IFEOLUMIPO
SOFOLA, M.D., APPELLANT

## CERTIFICATE OF COMPLIANCE (RULE 9.4)

The undersigned certifies that the above and foregoing Brief satisfies the requirements of Tex.R.App.P. 9.4 because the Brief contains 4,873 words.

/s/William L. Van Fleet II
William L. Van Fleet II

24

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing Appellant's Brief was forwarded to counsel for Aetna Health, Inc. and Aetna Life Insurance Company, John B. Shely and Dena Palermo, 600 Travis, Suite 4200, Houston, Texas 77002, by electronic mail to JShely@andrewskurth.com and DenaPalermo@andrewskurth.com, on May 27, 2015.

/s/William L. Van Fleet II
William L. Van Fleet II

No. 01-15-00387-CV

IN THE COURT OF APPEALS
FIRST JUDICIAL DISTRICT
HOUSTON, TEXAS

IFEOLUMIPO O. SOFOLA, M.D.

*APPELLANT*

VS.

AETNA HEALTH, INC. AND
AETNA LIFE INSURANCE COMPANY

*APPELLEES*

ON INTERLOCUTORY APPEAL FROM THE 152ND JUDICIAL
DISTRICT COURT OF HARRIS COUNTY, TEXAS
TRIAL COURT CASE NO. 2013-76814

APPENDIX TO APPELLANT'S BRIEF

# TABLE OF CONTENTS

**Tab 1:** Order dated April 6, 2015, denying Corrected Amended Motion for Contractual Severance of Claims and for Arbitration

**Tab 2:** Ifeolumipo O. Sofola, M.D.'s Corrected Amended Motion for Contractual Severance of Claims and for Arbitration

**Tab 3:** March 1, 2009 Specialist Physician Agreement by and between Ifeolumipo O. Sofola, M.D. and Aetna Health, Inc. "and its Affiliates"

TAB 1

CAUSE NO. 2013-76814

| | | |
|---|---|---|
| AETNA HEALTH INC. and AETNA LIFE INSURANCE COMPANY, | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § | |
| vs. | § § § | HARRIS COUNTY, TEXAS |
| MICHAEL L. BLACKWELL, M.D.; IFEOLUMIPO O. SOFOLA, M.D.; BATJAC SURGICAL GROUP, PLLC; STARLIGHT SURGICAL, PLLC, | § § § § | |
| *Defendants.* | § | 152ND JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
APR 0 6 2015
Time:
Harris County, Texas
By
Deputy

## ORDER

Defendant Ifeolumipo O. Sofola, M.D.'s Corrected Amended Motion for Contractual Severance of Claims and for Arbitration is DENIED.

Signed this ___ day of March, 2015.

APR 0 6 2015

Robert K. Schaffer
Presiding Judge

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

HOU:3539339.1

TAB 2

CAUSE NO. 2013-76814

| | | |
|---|---|---|
| AETNA HEALTH INC. and AETNA LIFE INSURANCE COMPANY, | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § | |
| v. | § § | HARRIS COUNTY TEXAS |
| MICHAEL L. BLACKWELL, M.D.; IFEOLUMIPO O. SOFOLA, M.D.; BATJAC SURGICAL GROUP, PLLC; STARLIGHT SURGICAL, PLLC | § § § § | 152ND JUDICIAL |

### IFEOLUMIPO O. SOFOLA, M.D.'S CORRECTED AMENDED MOTION FOR CONTRACTUAL SEVERANCE OF CLAIMS AND FOR ARBITRATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant and Counter-plaintiff Ifeolumipo O. Sofola, M.D, subject to and not waiving his pending request for arbitration, and files this Corrected Amended Motion for Contractual Severance of Claims and for Arbitration and shows this Honorable Court the following:

I.

1. As has been previously briefed in this matter, Aetna's relationship with Dr. Sofola is controlled by a written contract, called a Specialist Physician Agreement ("SPA"). Pursuant to the terms of the SPA, Aetna agreed never to add any additional defendant or party to any arbitration or "other proceeding" concerning any dispute with Dr. Sofola. Specifically, Paragraph 8.4 of the SPA reads as follows:

> **Arbitration Solely Between Parties: No Consolidation or Class Action.**
> Any arbitration or other proceeding related to a dispute arising under this Agreement shall be conducted solely between them. Neither Party shall request, nor consent to any request, that their dispute be joined or consolidated for any

purpose, including without limitation any class action or similar procedural device, with any other proceeding between such Party and any third party.

The above provision unambiguously imposes a contractual duty on Aetna not to bring other defendants into any suit or arbitration against Dr. Sofola. Aetna has breached this contractual provision. Dr. Sofola moves for a severance of any and all of Aetna's claims against him from these proceedings as well as severance of Dr. Sofola's affirmative counterclaims against Aetna. Request is also made that the severed case be dismissed/stayed and sent to arbitration as required by the SPA.

II.

2.      The severed cause is asked to be styled, **Cause No. 2013-76814-A** *Ifeolumipo O. Sofola, M.D. v. Aetna Health, Inc. and Aetna Life Insurance Company.* Copies of the following documents are requested to be included in this severed cause:

| Document No. | Document Name |
|---|---|
| | A copy of this Order Granting Severance |
| 64712766 | First Supplement to Ifeolumpio O. Sofola, M.D.'s Motion for Contractual Severance of Claims and for Arbitration. |
| 64712767 | Exhibit 1 |
| 64684827 | Sofola's Rule 4 Notice of Additional Counsel as to Affirmative Claims |
| 64648924 | Ifeolumipo O. Sofola, M.D.'s Motion for Contractual Severance of Claims and for Arbitration |
| 6468927 | Notice of Appearance and Designation of Lead Counsel |
| 64648930 | Notice of Hearing |
| 64648925 | proposed Order |

| | |
|---|---|
| 64641758 | Ifeolumipo O. Sofola, M.D.'s CounterClaim Against Aetna Health, Inc. and Aetna Life Insurance Company, Filed Subject to the Express Arbitration Provision and Request For Arbitration Pending Before This Court |
| 64053231 | Notice of Hearing |
| 63926056 | Plaintiff's Response to Defendants' Motion to Dismiss for Mandatory Arbitration and for Stay |
| 63842355 | DOCKET CONTROL/PRETRIAL ORDER SIGNED |
| 63797355 | Exhibit A |
| 63797356 | Exhibit B |
| 63797357 | Exhibit C |
| 63797358 | Exhibit D |
| 63762139 | Notice of Oral Hearing |
| 63745864 | Defendants' motion to dismiss for mandatory arbitration and for stay |
| 63745865 | Exhibit 1 |
| 63745866 | Exhibit 2 |
| 63745867 | Exhibit 3 |
| 63745868 | Exhibit 4 |
| 63745869 | Exhibit 5 |
| 63745870 | Exhibit 6 |
| 63745871 | Exhibit 7 |
| 63745872 | Exhibit 8 |
| 63745873 | Exhibit 9 |

| | |
|---|---|
| 63745874 | Proposed order |
| 63120426 | Aetna's Response to Defendants' Motions for Summary Judgment |
| 63120427 | Notice of Hearing |
| 63120428 | Proposed Order Denying Defendants' Motion for Summary Judgment |
| 63102687 | Plaintiffs' First Amended Petition |
| 63102688 | Exhibit A |
| 63102689 | Exhibit B |
| 63102690 | Exhibit C |
| 63102692 | Exhibit D |
| 63102693 | Exhibit E |
| 62921788 | Defendants' motion for summary judgment and motion for no evidence summary judgment |
| 62921789 | Exhibit 1 |
| 62921790 | Exhibit 2 |
| 62921791 | Proposed order on defendants' motion for summary judgment and motion for no evidence summary judgment |
| 59917139 | DEFENDANTS' REPLY TO AETNA'S RESPONSE TO PLEA TO THE JURISDICTION, SPECIAL EXCEPTIONS AND ANSWER |
| 59917140 | Exhibit A |
| 59917141 | Exhibit B |
| 59917142 | Exhibit C |
| 59917143 | Proposed Order granting Defendants' Plea to the Jurisdiction |

| | |
|---|---|
| 59867026 | Aetna's response to defendants' plea to the jurisdiction and special exception |
| 59867027 | Exhibit 2 |
| 59867028 | Exhibit 1 |
| 59624693 | Amended Notice of Oral Hearing |
| 59599042 | Notice of Oral Hearing |
| 59606375 | Notice of Oral Hearing |
| 59470825 | Defendants' plea to the jurisdiction, special exception, and answer |
| 59259667 | Citation |
| 59261923 | Citation corporate |
| 59261924 | CITATION |
| 59261941 | Citation |
| 59261945 | Citation corporate |
| 59273424 | Citation |
| 59273746 | CITATION |
| 59274663 | Citation |
| 59137526 | Civil Process Pick-Up Form |
| 59013709 | ORDER TRANSFERRING CASE TO ANOTHER DISTRICT COURT SIGNED |
| 58937283 | plaintiff's original petition |

A suggested order is attached.

Respectfully submitted,

_/s/ Benjamin L. Hall, III_

Benjamin L. Hall, III
State Bar No. 08743745
Kimberly R. Bennett
State Bar No. 24011946
The Hall Law Firm
530 Lovett Blvd.
Houston, Texas 77006
Telephone: 713-942-9600
Facsimile: 713-942-9566

ATTORNEYS FOR
COUNTER-PLAINTIFF,
IFEOLUMIPO O. SOFOLA, M.D.

## CERTIFICATE OF CONFERENCE

Attempts have been made to confer with defense counsel. No agreement has been reached. Accordingly, the Court's assistance is needed.

_/s/ Benjamin L. Hall, III_
Benjamin L. Hall, III

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document was forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on March 26th 2015.

_/s/ Benjamin L. Hall, III_
Benjamin L. Hall, III

TAB 3

# SPECIALIST PHYSICIAN AGREEMENT

## TABLE OF CONTENTS

1.0    DEFINITIONS ........................................................................................................................................... 3

2.0    SPECIALIST PHYSICIAN SERVICES AND OBLIGATIONS ........................................................ 6

    2.1    PROVISION OF SERVICES. ..................................................................................................... 6
    2.2    NON-DISCRIMINATION ........................................................................................................... 6
    2.3    REFERRAL BY PRIMARY CARE PHYSICIAN ........................................................................ 7
    2.4    PHYSICIAN REPRESENTATIONS. ........................................................................................ 7
    2.5    PHYSICIAN'S INSURANCE. ................................................................................................... 8
    2.6    PRODUCT PARTICIPATION. .................................................................................................. 8
    2.7    CONSENTS TO RELEASE MEDICAL INFORMATION. .......................................................... 8
    2.8    ENCOUNTER DATA. ............................................................................................................... 9

3.0    COMPANY OBLIGATIONS. ...................................................................................................... 9

    3.1    COMPANY'S COVENANTS. .................................................................................................... 9
    3.2    COMPANY REPRESENTATIONS. .......................................................................................... 9
    3.3    COMPANY'S INSURANCE. ..................................................................................................... 9

4.0    CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING ....................................... 9

    4.1    CLAIM SUBMISSION AND PAYMENT. ................................................................................... 9
    4.2    COORDINATION OF BENEFITS. .......................................................................................... 13
    4.3    MEMBER BILLING. ............................................................................................................... 13

5.0    COMPLIANCE WITH POLICIES. ............................................................................................ 14

    5.1    POLICIES. ............................................................................................................................. 14
    5.2    NOTICES AND REPORTING. ............................................................................................... 14
    5.3    INFORMATION AND RECORDS. .......................................................................................... 14
    5.4    QUALITY, ACCREDITATION AND REVIEW ACTIVITIES. ..................................................... 15
    5.5    PROPRIETARY INFORMATION. ........................................................................................... 15

6.0    TERM AND TERMINATION. ................................................................................................... 16

    6.1    TERM. .................................................................................................................................. 16
    6.2    TERMINATION WITHOUT CAUSE. ...................................................................................... 16
    6.3    TERMINATION FOR BREACH. ............................................................................................ 16
    6.4    IMMEDIATE TERMINATION OR SUSPENSION. ................................................................... 16
    6.5    OBLIGATIONS FOLLOWING TERMINATION. ....................................................................... 17
    6.6    OBLIGATIONS DURING DISPUTE RESOLUTION PROCEEDINGS. ...................................... 17

7.0    RELATIONSHIP OF THE PARTIES ........................................................................................ 18

    7.1    INDEPENDENT CONTRACTOR STATUS. ............................................................................ 18
    7.2    USE OF NAME. ..................................................................................................................... 18
    7.3    INTERFERENCE WITH CONTRACTUAL RELATIONS. ........................................................ 18

8.0    DISPUTE RESOLUTION ........................................................................................................ 18

    8.1    MEMBER GRIEVANCE DISPUTE RESOLUTION. ................................................................ 18
    8.2    PHYSICIAN DISPUTE RESOLUTION. .................................................................................. 19
    8.3    ARBITRATION. ..................................................................................................................... 19
    8.4    ARBITRATION SOLELY BETWEEN PARTIES; NO CONSOLIDATION OR CLASS ACTION. ... 19

9.0    MISCELLANEOUS ................................................................................................................. 19

    9.1    AMENDMENTS. .................................................................................................................... 19

| 9.2 | WAIVER. | 19 |
|---|---|---|
| 9.3 | GOVERNING LAW. | 19 |
| 9.4 | LIABILITY. | 20 |
| 9.5 | SEVERABILITY. | 20 |
| 9.6 | SUCCESSORS; ASSIGNMENT. | 20 |
| 9.7 | HEADINGS. | 20 |
| 9.8 | NOTICES. | 20 |
| 9.9 | REMEDIES. | 21 |
| 9.10 | FORCE MAJEURE. | 21 |
| 9.11 | NON-EXCLUSIVITY. | 21 |
| 9.12 | SURVIVAL. | 21 |
| 9.13 | ENTIRE AGREEMENT. | 21 |

# SPECIALIST PHYSICIAN AGREEMENT

This Specialist Agreement ("Agreement") is made and entered into as of _March of_, 2009 ("Effective Date") by and between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter "Company") and _Ifeoluwapo Sofola, MD_ (hereinafter "Physician").

**WHEREAS,** Company offers, issues and administers Full Risk Plans and Plans for Plan Sponsors that provide access to health care services to Members; and

**WHEREAS,** Company contracts with certain health care providers and facilities to provide access to such health care services to Members; and

**WHEREAS,** Physician provides health care services to patients within the scope of Physician's licensure or accreditation; and

**WHEREAS,** Company and Physician mutually desire to enter into an arrangement whereby Physician will become a Participating Provider and render health care services to Members; and

**WHEREAS,** in return for the provision of health care services and other obligations assumed by Physician under this Agreement, Company will pay Physician's claims for Covered Services under the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants, promises and undertakings in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties agree as follows:

## 1.0   DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

1.1   **AAA.** Defined in Section 8.3 of this Agreement.

1.2   **Affiliate.** Any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with Company.

1.3   **Agreement.** Defined in first paragraph of this Agreement.

1.4   **Clean Claim.** A clean claim is a claim that contains the information that is required by applicable Texas law and regulations adopted by the Commissioner of Insurance, and is submitted consistent with Aetna's established processing procedures to the extent Aetna establishes the information and processing procedure requirements consistent with applicable Texas law and regulations.

1.5   **Coinsurance.** The percentage of the lesser of: (a) the rates established under this Agreement; or (b) Physician's usual, customary and reasonable billed charges, which a Member is required to pay for Covered Services under a Plan.

1.6   **Company.** Defined in first paragraph of this Agreement.

1.7   **Confidential Information.** Any information that identifies a Member and is related to the Member's participation in a Plan, the Member's physical or mental health or condition, the provision of health care to the Member or payment for the provision of health care to the Member. Confidential Information includes, without limitation, "individually identifiable health information," as defined in 45 C.F.R. § 160.103 and "non-public personal information" as defined in laws or regulations promulgated under the Gramm-Leach-

Bliley Act of 1999, and vendor cost information that Provider uses to price percentage of billed charge services subject to "Cost Plus Services" markup.

1.8 Copayment. A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services, or at such other time as determined by Physician.

1.9 Cost Plus Services. Those healthcare services that are paid for under the Plan based on a percentage markup over the Provider's documented cost.

1.10 Covered Services. Those health care services that are paid for under the applicable Plan and that are not otherwise excluded or limited. The Parties agree that Company is obligated to pay for only those Covered Services that are determined to be medically necessary, as determined in accordance with the Member's applicable Plan.

1.11 Covering Physician. A Participating Provider designated by Physician to provide Covered Services to Members when Physician is unavailable (e.g. out of the office or on vacation).

1.12 Deductible. An amount that a Member must pay for Covered Services during a specified coverage period in accordance with the Member's Plan before benefits will be paid.

1.13 Effective Date. Defined in first paragraph of this Agreement.

1.14 Emergency Services. Those services necessary to treat a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (a) placing the health of the individual (or, with respect to a pregnant woman, her pregnancy or health or the health of her fetus) in serious jeopardy; (b) serious impairment to bodily functions; or (c) serious dysfunction of any bodily organ or part; or such other definition as may be required by applicable law.

1.15 Full Risk Plan. A Plan where Company is the underwriter, in full, of the Plan (i.e. fully-insured Plans).

1.16 Government Programs. Defined in Section 2.4.3 of this Agreement.

1.17 Information. Defined in Section 5.3.2 of this Agreement.

1.18 Initial Term. Defined in Section 6.1 of this Agreement.

1.19 License. Defined in Section 3.2 of this Agreement.

1.20 Material Change. Any change in Policies that could reasonably be expected, in Company's determination, to have a material adverse impact on (i) Physician's reimbursement for Physician Services or (ii) administration of Physician's practice.

1.20 Medically Necessary or Medical Necessity. Health care services that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease, and (c) not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury, or disease. For these purposes "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, or otherwise consistent with physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

1.21 Member. An individual covered by or enrolled in a Plan.

1.22 Participating Provider. Any physician, hospital, hospital-based physician, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and, where applicable, has been credentialed by Company or its designee consistent with Company's credentialing policies. Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians" or "Participating Hospitals."

1.23 Party. Company or Physician, as applicable.

1.24 Physician. Defined in first paragraph of this Agreement.

1.25 Plan. A Member's health care benefits as set forth in the Member's Summary Plan Description, Certificate of Coverage or other applicable coverage document.

1.26 Plan Sponsor. An employer, insurer, third party administrator, labor union, organization or other person or entity which has contracted with Company to offer, issue and/or administer a Plan that is not a Full Risk Plan and has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

1.27 Policies. The policies and procedures promulgated by Company which relate to this Agreement, including, but not limited to: (a) quality improvement/management; (b) utilization management, including, but not limited to, precertification of elective admissions and procedures, concurrent review of services and referral processes or protocols; (c) pre-admission testing guidelines; (d) claims payment review; (e) member grievances; (f) Physician credentialing; (g) electronic submission of claims and other data required by Company; and (h) any applicable Participation Criteria as set forth in the **Participation Criteria Schedules.** Policies also include those policies and procedures set forth in the Company's manuals, Health Care Professional Toolkit or their successors (as modified from time to time); Clinical Policy Bulletins made available via Company's internet web site; and other policies and procedures, whether made available via a password-protected web site for Participating Physicians (when available), by letter, newsletter, electronic mail or other media. "Precertification" when used in this Agreement means the utilization review process to determine whether the requested service, procedure, prescription drug or medical device meets the Company's clinical criteria for coverage. Precertification does not mean verification which is defined by Texas law, as a reliable representation of payment of care or services to fully insured HMO and PPO members.

1.28 Primary Care Physician. A Participating Physician whose area of practice and training is family practice, general medicine, internal medicine or pediatrics, or who is otherwise designated as a Primary Care Physician by Company, and who has agreed to provide primary care services and to coordinate and manage all Covered Services for Members who have selected or been assigned to such Participating Physician, if the applicable Plan provides for a Primary Care Physician.

1.29 Proprietary Information. Any and all information, whether prepared by a Party, its advisors or otherwise, relating to such Party or the development, execution or performance of this Agreement whether furnished prior to or after the Effective Date. Proprietary Information includes but is not limited to, with respect to Company, the development of a pricing structure, (whether written or oral) all financial information, rate schedules and financial terms which relate to Physician and which are furnished or disclosed to Physician by Company. Notwithstanding the foregoing, the following shall not constitute Proprietary Information:

(a) information which was known to a receiving Party (a "Recipient") prior to receipt from the other Party (a "Disclosing Party") (as evidenced by the written records of a Recipient);

(b) information which was previously available to the public prior to a Recipient's receipt thereof from a Disclosing Party;

(c) information which subsequently became available to the public through no fault or omission on the part of a Recipient, including without limitation, the Recipient's officers, directors, trustees, employees, agents, contractors and other representatives;

(d) information which is furnished to a Recipient by a third party which a Recipient confirms, after due inquiry, has no confidentiality obligation, directly or indirectly, to a Disclosing Party; or

(e) information which is approved in writing in advance for disclosure or other use by a Disclosing Party.

1.30 **Records.** Defined in Section 5.3.2 of this Agreement.

1.31 **Rules.** Defined in Section 8.3 of this Agreement.

1.32 **Specialty Program.** A Company established program for a targeted group of Members with certain types of illnesses, conditions, cost or risk factors (e.g., organ transplants, women's health, other disease management programs, etc).

1.33 **Specialty Program Providers.** Those hospitals, Participating Physicians and other providers that have been identified or designated by Company to provide transplant services and other Covered Services associated with a Specialty Program. Certain categories of Specialty Program Providers may be referred to herein more specifically as, e.g. "Specialty Program Physician".

1.34 **Specialist Services.** Defined in Section 2.1 of this Agreement.

## 2.0 SPECIALIST PHYSICIAN SERVICES AND OBLIGATIONS

2.1 **Provision of Services.**

Physician shall provide to Members those services which are within the scope of Physician's license and certification to practice ("Specialist Services"). Physician shall also, as applicable, arrange and coordinate the overall provision of Covered Services to Members under the terms and conditions of the Member's applicable Plan. Physician shall provide or arrange for the provision of Covered Services, including, without limitation, urgently needed services or Emergency Services, regardless of whether Physician has previously seen or treated the Member. Unless otherwise permitted by applicable law or regulation, Physician may not provide any Covered Services to Members unless and until Physician has been fully credentialed and approved by the applicable peer review committee.

Upon written notice from Provider, Company may agree to add new or relocating facilities, locations or providers to existing Agreement upon completion of applicable credentialing and satisfaction of all other requirements of Company. Other demographic information may be revised upon written notice from Provider.

2.2 **Non-Discrimination**

2.2.1 **Equitable Treatment of Members.** Physician agrees to provide Physician Services to Members with the same degree of care and skill as customarily provided to Physician's patients who are not Members, according to generally accepted standards of Physician practice. Physician and Company agree that Members and non-Members should be treated equitably; to that end Physician agrees not to discriminate against Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Physician Services required, or any other grounds prohibited by law or this Agreement.

2.2.2 **Affirmative Action.** Company is a Federal contractor and an Equal Opportunity Employer which maintains an Affirmative Action Program. To the extent applicable to Physician, Physician, on behalf of itself and any subcontractors, agrees to comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act

of 1964, the Age Discrimination Act of 1975, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") administrative simplification rules at 45 CFR parts 160, 162, and 164, the Americans with Disabilities Act of 1990, Federal laws, rules and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (Section 1128B(b) of the Social Security Act), and any similar laws, regulations or other legal mandates applicable to recipients of federal funds and/or transactions under or otherwise subject to any government contract of Company.

2.3   Referral by Primary Care Physician.
Except for Emergency Services, if a referral is required by the Member's Plan, Provider shall provide Specialist Services to Members only upon prior referral of such patients by a Primary Care Physician to Provider on prescribed forms or by electronic means as instructed by Company. Except for Emergency Services, payment for retroactive referrals shall be subject to adjustment or denial by Company in accordance with Policies. Physician shall render services to Members only at Participating Hospitals or other Providers, or those inpatient, extended care, and ancillary service facilities which have otherwise been approved in advance by Company. Physician agrees promptly to submit a report on the treatment of each Member to the referring Primary Care Physician, if such Member was referred to the Specialist Physician by a Primary Care Physician in accordance with the Member's Plan.

2.4   Physician Representations.

2.4.1   General Representations. Physician represents, warrants and covenants, as applicable, that: (a) it has, and shall maintain throughout the term of this Agreement all appropriate license(s) and certification(s) mandated by governmental regulatory agencies, including without limitation DEA certification and an unrestricted license to practice medicine in the state(s) in which Physician maintains offices and provides Specialist Services to Members; (b) Physician is board certified or board eligible in the specialty for which Physician provides Specialist Services; (c) it is, and will remain throughout the term of this Agreement, in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided under this Agreement, including, without limitation, statutes and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, self-referral, false claims and prohibition of kickbacks; (d) Physician has and shall maintain throughout the term of this Agreement unrestricted hospital privileges at a Participating Hospital, (e) this Agreement has been executed by its duly authorized representative; and (f) executing this Agreement and performing its obligations under this Agreement shall not cause Physician to violate any term or covenant of any other agreement or arrangement now existing or subsequently executed.

2.4.2   Qualified Personnel. Physician also represents that Physician has established an ongoing quality assurance/assessment program which includes, but is not limited to, credentialing of employees and subcontractors. Physician shall supply to Company the relevant documentation, including, but not limited to, internal quality assurance/assessment protocols, state licenses and certifications, Federal agency certifications and/or registrations upon request. Physician further represents that all personnel employed by, associated or contracted with Physician who treat Members: (a) are and shall remain throughout the term of this Agreement appropriately licensed and/or certified and supervised (when and as required by state law), and qualified by education, training and experience to perform their professional duties; and (b) shall act within the scope of their licensure or certification, as the case may be. Company may audit Physician's compliance with this section upon prior written notice.

2.4.3   Government Program Representations. Company has or may seek a contract to serve Medicare, Medicaid, CHIP, and/or Tricare beneficiaries ("Government Programs"). To the extent Company participates in such Government Programs, Physician agrees, on behalf of itself and any subcontractors of Physician acting on behalf of Physician, to be bound by all rules and regulations of, and all requirements applicable to, Government Programs. Physician acknowledges and agrees that all provisions of this Agreement shall apply equally to any employees, independent contractors and subcontractors of Physician who provide or may provide Covered Services to Members of Government Programs, and Physician represents and warrants that Physician shall take all steps

necessary to cause such employees, independent contractors and subcontractors to comply with the Agreement and all applicable laws, rules and regulations and perform all requirements applicable to Government Programs. With respect to Members of Government Programs, Physician acknowledges that compensation under this Agreement for such Members constitutes receipt of Federal funds. Physician agrees that all services and other activities performed by Physician under this Agreement will be consistent and comply with Company's obligations under its contract(s) with the Centers for Medicare and Medicaid Services (CMS), and any applicable state regulatory agency, to offer Medicare/Medicaid Plans. Physician further agrees to allow CMS, any applicable state regulatory agency, and Company to monitor Physician's performance under this Agreement on an ongoing basis in accordance with Medicare/Medicaid laws, rules and regulations. Physician acknowledges and agrees that Company may only delegate its activities and responsibilities under its contract(s) with CMS and any applicable regulatory agency, to offer Medicare/Medicaid Plans in a manner consistent with Medicare/Medicaid laws, rules and regulations, and that if any such activity or responsibility is delegated by Company to Physician, the activity or responsibility may be revoked if CMS or Company determine that Physician has not performed satisfactorily.

If Company designates Provider to participate in a Government Program pursuant to Section 2.5 below, Provider may opt out of participation of that Government Program. Provider shall have thirty (30) days from receipt of Company's notice of designation, to notify Company in writing if Provider elects not to participate in that Government Program.

### 2.5 Physician's Insurance.
During the term of this Agreement, Physician agrees to procure and maintain such policies of general and professional liability and other insurance at minimum levels required from time to time by Company, but in no event less than: (a) professional liability insurance at a minimum level of $1,000,000 per claim $1,000,000 annual aggregate and (b) comprehensive general liability insurance at a minimum level of $1,000,000 per claim/$3,000,000 annual aggregate. Such insurance coverage shall cover the acts and omissions of Physician as well as those of Physician's agents and employees. Physician agrees to deliver memorandum copies of these policies to Company upon request. Physician agrees to make best efforts to provide to Company at least thirty (30) days advance notice, and in any event will provide notice as soon as reasonably practicable, of any cancellation or material modification of these policies.

### 2.6 Product Participation.
Physician agrees to participate in the Plans and other health benefit products as described in on the Product Participation Schedule. Company reserves the right upon ninety (90) days prior notice, to introduce, modify and designate Physician's participation in new Plans, Specialty Programs and products during the term of this Agreement and will provide Physician with written notice of such new Plans, Specialty Programs and products and the associated compensation.

Nothing in this Agreement shall require that Company identify, designate or include Physician as a preferred participant in any specific Plan, Specialty Program or product; provided, however, Physician shall accept compensation in accordance with this Agreement for the provision of any Covered Services to Members under a Plan, Specialty Program or product in which Physician has agreed to participate in this Agreement.

Company may sell, lease, transfer or otherwise convey to payers (other than Plan Sponsors) which do not compete with Company's product offerings (e.g., workers' compensation or automobile insurers) in the geographic area where Physician provides Covered Services, the benefits of this Agreement, including, without limitation, the **Services and Compensation Schedule**, under terms and conditions which will be communicated to Physician in each such case. For those programs and products which are not health benefit products (e.g., worker's compensation or auto insurance), Physician shall have thirty (30) days from receipt of the Company's notice to notify Company in writing if Physician elects not to participate in these products(s).

### 2.7 Consents to Release Medical Information.
Physician covenants that it will obtain from Members to whom Physician provides Physician Services, any necessary consents or authorizations to the release of Information and Records to Company, Plan Sponsors,

their agents and representatives. In performing this covenant, Provider shall comply with any applicable Federal or state law or regulation or this Agreement.

2.8 Encounter Data.

For those services for which Physician is compensated on a capitated basis, if any, Physician agrees to provide Company with encounter data by type of Specialist Service rendered to Members in the form and manner as specified by Company. There shall be no restrictions on Company's use of such encounter data. Furthermore, Company is under no obligation to return such encounter data to Physician.

## 3.0 COMPANY OBLIGATIONS

3.1 Company's Covenants.

Company or Plan Sponsors shall provide Members with a means to identify themselves to Physician (e.g., identification cards), explanation of Physician payments, a general description of products (e.g., Quick Reference Card), a listing of Participating Physicians, and timely notification of Material Changes in this information. Company shall provide Physician with a means to check Member eligibility. Company shall include Physician in the Participating Provider directory or directories for the Plans, Specialty Programs and products in which Physician is a Participating Physician, including when Physician is designated as preferred participant, and shall make these directories available to Members. Company reserves the right to determine the content of Physician directories.

3.2 Company Representations.

Company represents and warrants that: (a) it, where applicable, is licensed to offer, issue and administer Plans in the service areas covered by this Agreement by the applicable regulatory authority ("License"); (b) it will not lose such License involuntarily during the course of this Agreement; (c) it is, and will remain throughout the term of this Agreement, substantially in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided under this Agreement; including without limitation, any applicable prompt payment statutes and regulations or capital reserve requirements; provided however, that for the purposes of (b) and (c), Physician will have no basis for termination to the extent that such action does not impact the obligations of Company under this Agreement; (d) this Agreement has been executed by its duly authorized representative; and (e) executing this Agreement and performing its obligations under this Agreement shall not cause Company to violate any term or covenant of any other agreement or arrangement now existing or subsequently executed.

3.3 Company's Insurance.

Company at its sole cost and expense agrees to procure and maintain such policies of general and/or professional liability and other insurance (or maintain a self-insurance program) as shall be necessary to insure Company and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by Company under this Agreement and the administration of Plans.

## 4.0 CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING

4.1 Claim Submission and Payment.

4.1.1 Physician Obligation to Submit Claims. Physician agrees to submit Clean Claims for non-capitated services to Company for Physician Services rendered to Members. With respect to Government Programs, Physician agrees to submit claim and risk adjustment data related to a Member enrolled in a Government Program in the form and manner as specified by Company. Physician certifies that any such data is accurate, complete and truthful. Physician will make best commercial efforts to submit a minimum of eighty-five percent (85%) of its Member claims electronically to Company. Physician represents that, where necessary, it has obtained signed assignments of benefits authorizing payment for Physician Services to be made directly to Physician. For claims Physician submits electronically, Physician shall not submit a claim to Company in paper form unless Company fails to pay or otherwise

respond to electronic claims submission in accordance with the time frames required under this Agreement or applicable law or regulation. Physician agrees that Company, or the applicable Plan Sponsor, will not be obligated to make payments for billings received more than one hundred and twenty (120) days from (a) the date of service or, (b) the date of receipt of the primary payer's explanation of benefits when Company is the secondary payer. This limit is ninety-five (95) days for Medicaid and CHIP plans. Except for Medicaid and CHIP plans, this requirement will be waived in the event Physician provides notice to Company, along with appropriate evidence, of extraordinary circumstances outside the control of Physician that resulted in the delayed submission. In addition, unless Physician notifies Company of any payment disputes within one hundred eighty (180) days, or such longer time as required by applicable state law or regulation, of receipt of payment from Company, such payment will be considered full and final payment for the related claims. Except as otherwise required under applicable Federal, or state law or regulation, or a Plan, if Physician does not bill Company or Plan Sponsors, or disputes any payment, timely as provided in this Section 4.1.1, Physician's claim for payment will be deemed waived and Physician will not seek payment from Plan Sponsors, Company or Members. Physician shall pay on a timely basis all employees, independent contractors and subcontractors who render Covered Services to Members of Company's Medicare/Medicaid Plans for which Physician is financially responsible pursuant to this Agreement.

Physician agrees to permit rebundling to the primary procedure those services considered part of, incidental to, or inclusive of the primary procedure and make other adjustments for inappropriate billing or coding (e.g., duplicative procedures or claim submissions, mutually exclusive procedures, gender/procedure mismatches, age/procedure mismatches). To the extent Physician is billing on a CMS 1500, as of the Effective Date, in performing rebundling and making adjustments for inappropriate billing or coding, Company utilizes a commercial software package (as modified by Company for all Participating Physicians in the ordinary course of Company's business) which commercial software package relies upon Medicare/Medicaid and other industry standards in the development of its rebundling logic.

4.1.2 <u>Company Obligation to Pay Covered Services</u>. Company agrees to: (a) pay Physician for Covered Services rendered to members of Full Risk Plans, and (b) notify Plan Sponsors to forward payment to Company for payment to Physician for Covered Services rendered to a Plan Sponsor's Members. Such payment shall be made as follows: (a) for capitated services physician shall be paid according to the Physician Compensation Model as set forth in the Services and Compensation Schedule; (b) for non-capitated services: the lesser of (i) Physician's usual, customary and reasonable (ucr) billed charges; (ii) the rates set forth in the Services and Compensation Schedule; or (iii) the fee schedule then in effect as applicable to such Member's Plans, within forty-five (45) days (or such shorter time as required by applicable law or regulation) of actual receipt by Company of a Clean Claim. Except for capitated services, in the event Company fails to pay Clean Claims within forty-five (45) days (or such shorter time as required by applicable law or regulation) of receipt, Company shall pay a penalty as required by applicable law or regulation. In relation to Full risk plans, if applicable law or regulation does not require a penalty for Company's failure to pay a clean claim within the time period required by applicable law or regulation, then Physician shall not be entitled to billed charges or any penalty. Physician shall not be entitled to billed charges or any penalty for claims submitted in relation to Plan Sponsor Plans. (Plan Sponsor Plans are not Full Risk Plans.) The receipt date for claims will be determined in accordance with applicable law or regulation.

Except as otherwise required under applicable Federal, or state law or regulation, or a Plan, if Company pays a claim and afterwards either --

4.1.2.1 Company discovers a possible underpayment to Physician within the time period for Physician to dispute payments stated in Section 4.1.1, or

4.1.2.2 Physician discovers a possible underpayment to Physician and gives prompt notice to Company within the time period for Physician to dispute payments stated in section 4.1.1 above.

then Company shall review the claim within forty-five (45) days of Company's discovery or Physician's notice, and shall pay any eligible unpaid portion of the claim. In relation to Full Risk Plans, if applicable law or regulation does not require a penalty for Company's failure to pay a clean claim within the time period required by applicable law or regulation, then Physician shall not be entitled to billed charges or any penalty for a possible underpayment. Physician shall not be entitled to billed charges or any penalty for possible underpayment for claims submitted in relation to Plan Sponsor Plans. (Plan Sponsor Plans are not Full Risk Plans.)

When required, Company shall comply with all applicable statutes and rules pertaining to prompt payment of clean claims, including Texas Insurance Code Sections 1301.101-1301-109, Sections 1301.131-1301.138,, Sections 843.336–843.353, and 28 Texas Administrative Code Sections 21.2801-21.2826, with respect to payment to a Participating Provider for Covered Services that are rendered to Members.

In accordance with applicable law and regulation, including but not limited to Texas Insurance Code Sec. 1301.136 and Sec. 843.321:

(1) Physician may request a description and copy of the coding guidelines, including any underlying bundling, recoding, or other payment process and fee schedules applicable to specific procedures that the Physician will receive under the contract;

(2) Company or Company's agent will provide the coding guidelines and fee schedules not later than the 30th day after the date the Company receives the request;

(3) Company or Company's agent will provide notice of changes to the coding guidelines and fee schedules that will result in a change of payment to Physician not later than the 90th day before the date the changes take effect and will not make retroactive revisions to the coding guidelines and fee schedules;

(4) The contract may be terminated by Physician on or before the 30th day after the date Physician receives information requested under this subsection without penalty or discrimination in participation in other health care products or plans;

(5) Physician shall only use or disclose the information for the purpose of practice management, billing activities, and other business operations; and disclose the information to a governmental agency involved in the regulation of health care or insurance;

(6) Company shall, on request of Physician, provide the name, edition, and model version of the software that Company uses to determine bundling and unbundling of claims.

Physician will make best commercial efforts to utilize online explanation of benefits or electronic remittance of advice (or combination thereof) and electronic funds transfer in lieu of receiving paper equivalents. While Company may pay claims on behalf of Plan Sponsors, Physician and Company acknowledge that Company has no legal responsibility for the payment of such claims for Covered Services rendered to a Plan Sponsor's Members; provided, however, that Company agrees to reasonably assist Physician as appropriate in collecting any such payments. Where there is a Plan Sponsor, Company shall have no obligation to pay Physician in the event the Plan Sponsor or member fails to pay Physician.

Except as otherwise required under applicable Federal, or state law or regulation, or a Plan, Company may, from time to time, notify Physician of overpayments to Physician, and Physician agrees to of any such overpayment or payment made in error (e.g., a duplicate payment or payment for services rendered by Physician to a patient who was not a Member) within a reasonable period of time. In the event Company is unable to secure the return of any such payment within forty-five (45) days. In the event Physician fails to return overpayments within forty-five (45) days of receipt, upon written notice from Company of such event, Physician shall pay a contracted penalty of 1.0% per month simple interest on the eligible, unrepaid portion of such overpayment, beginning on the forty-sixth (46th) day after receipt of notice of such overpayment(s). If the overpayment request is mailed, the Physician's receipt date will be the fifth (5th) calendar day following the postmark date. Company shall not be entitled to collect any other penalty, charge or fee, for Physician's failure to return overpayment of claims under any Full Risk Plans. Company shall not be entitled to the contracted penalty for

overpayments submitted in relation to Plan Sponsor Plans. Company reserves the right to offset such payment against any other monies due to Physician under this Agreement provided Company has delivered to Physician at least ten (10) days prior written notice and Physician has otherwise failed to return such payment to Company. To the extent, if any, that the compensation under certain Plans is in the form of capitation payments or a case-based rate methodology, Physician acknowledges the financial risks to Physician of this arrangement and has made an independent analysis of the adequacy of this arrangement. Physician, therefore, agrees and covenants not to bring any action asserting the inadequacy of these arrangements or that Physician was in any way improperly induced by Company to accept the rate of payment, including, but not limited to, causes of actions for damages, rescission or termination alleging fraud or negligent misrepresentation or improper inducement. Furthermore, to the extent that the compensation under certain Plans is in the form of capitation payments or a case-based methodology and Physician utilizes the services of a Covering Physician, Physician agrees to hold Company, Affiliates, Sponsors, Members and Payers harmless against any and all claims by such Covering Physician related to or arising out of payment for Covered Services rendered to Members. Physician understands that if Company makes payment to such Covering Physician under the circumstances described above, Company may offset future capitation or case-rate payments by the amount paid to such Covering Physician. Notwithstanding anything in this Agreement to the contrary, during such time as Physician is a member of a Group, Physician agrees to seek compensation solely from Group for those Covered Services provided to Members and for which Group is compensated by Company on behalf of Physician, and Physician shall in no event bill Company, its Affiliates, Payers or Members for any such Covered Services (except for the collection of Copayments, Coinsurance, Deductibles in accordance with Section 4.3.1). Company may propose changes in the capitation rate or the Compensation Schedule upon ninety (90) days written notice to Physician.

If capitation applies, Company will comply with the requirements described in Texas Insurance Code Sections 843.315 and 843.316.

In accordance with Texas Insurance Code Sections 843.323 and 1301.0641, Company's clearinghouse may not refuse to process or pay an electronically submitted clean claim because the claim is submitted together with or in a batch submission with a claim that is not a clean claim.

4.1.3 <u>Utilization Management</u>. Company utilizes systems of utilization review/quality improvement/peer review to promote adherence to accepted medical treatment standards and to encourage Participating Physicians to minimize unnecessary medical costs consistent with sound medical judgment. To further this end, Physician agrees, consistent with sound medical judgment:

(a) To participate, as requested, and to abide by Company's utilization review, patient management, quality improvement programs, and all other related programs (as modified from time to time) and decisions with respect to all Members to other providers.

(b) To comply with Company's pre-certification and utilization management requirements for all elective admissions and other Covered Services.

(c) To regularly interact and cooperate with Company's nurse case managers, medical directors, and other related Company staff.

(d) If applicable, to utilize Participating Physicians to the fullest extent possible, consistent with sound medical judgment.

(e) To abide by all Company's credentialing criteria and procedures, including site visits and medical chart reviews, and to submit to these processes biannually, annually, or otherwise, when applicable.

(f) To obtain advance authorization from Company prior to any non-emergency admission. In cases where a Member requires an emergency hospital admission, Physician shall notify Company as soon as is reasonable, but in no event later than the next business day. Both of these requirements

shall be in accordance with Company's Policies then in effect at the time the services were rendered.

(g) To cooperate with Member's Primary Care Physician, if applicable, including timely scheduling of appointments and appropriate communication after patient evaluation and treatment.

Except when a Member requires Emergency Services, Physician agrees to comply with any applicable precertification and/or referral requirements under the Member's Plan prior to the provision of Physician Services. Physician agrees to notify Company of all admissions of Members, and of all services for which Company requires notice, upon admission or prior to the provision of such services. For those Members who require services under a Specialty Program, Physician agrees to work with Company in transferring the Member's care to a Specialty Program Physician.

4.2 Coordination of Benefits

Physician shall retain in its records updated information for a Member concerning other health benefit plan coverage and to provide the information to Company on the form described by applicable law or regulation, and if a form is not described by applicable law or regulation, in the manner specified by Company. Except as otherwise required under applicable Federal, or state law or regulation or a Plan, (a) when Company and Physician agree that Company or a Plan Sponsor, as the case may be, is the primary payer under applicable coordination of benefit principles, Company or the Plan Sponsor agrees to pay in accordance with this Agreement, and (b) when Company or a Plan Sponsor is secondary under said principles, and payment from the primary payer is less than the compensation payable under this Agreement without coordination of benefits, then Company or Plan Sponsor will pay Physician the amount of the difference between the amount paid by the primary payer and the compensation payable under this Agreement, absent other sources of payment. However, if payment from this primary payer is greater than or equal to the compensation payable under this Agreement without coordination of benefits, neither Company, Plan Sponsor nor the applicable Member (in accordance with Section 4.3.2 below) shall have any payment obligation to Physician. Notwithstanding anything to the contrary in this section, in no event shall Physician collect more than Medicare allows if Medicare is the primary payer. Medicaid is never the primary payer.

4.3 Member Billing.

4.3.1 Permitted Billing of Members. Physician may bill or charge Members only in the following circumstances: (a) applicable Copayments, Coinsurance and/or Deductibles not collected at the time that Covered Services are rendered; (b) individuals were not Members at the time that services were rendered; (c) a Plan Sponsor becomes insolvent or otherwise fails to pay Physician in accordance with applicable Federal law or regulation (e.g., ERISA) provided that Physician has first exhausted all reasonable efforts to obtain payment from the Plan Sponsor, however, this Section 4.3.1 (c) is not applicable to Medicaid Members; and (d) services that are not Covered Services only if: (i) the Member's Plan provides and/or Company confirms that the specific services are not covered; (ii) the Member was advised in writing prior to the services being rendered that the specific services may not be Covered Services; and (iii) the Member agreed in writing to pay for such services after being so advised. Physician acknowledges that Company's denial or adjustment of payment to Physician based on Company's performance of utilization management as described in Section 4.1.3 or otherwise is not a denial of Covered Services under this Agreement or under the terms of a Plan, except as required under applicable law or regulation, or if Company confirms otherwise under this Section 4.3. Physician may bill or charge individuals who were not Members at the time that services were rendered

4.3.2 Holding Members Harmless. Physician hereby agrees that in no event, including, but not limited to the failure, denial or reduction of payment by Company, insolvency of Company or breach of this Agreement, shall Physician bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse (i) against Members or persons acting on their behalf (other than Company) or (ii) any settlement fund or other *res* controlled by or on behalf of, or for the benefit of, a Member for Covered Services. This provision shall not prohibit collection of Copayments, Coinsurance, Deductibles or other supplemental charges made in accordance with the terms of the applicable Plan.

Physician further agrees that this Section 4.3.2: (a) shall survive the expiration or termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members; and (b) supersedes any oral or written contrary agreement or waiver now existing or hereafter entered into between Physician and Members or persons acting on their behalf.

To protect Members, Physician agrees not to seek or accept or rely upon waivers of the Member protections provided by this Section 4.3.

Any modifications, additions, deletions to the provisions of this clause shall become effective on a date no earlier than 90 days after notice to Physician of any such modification, addition, or deletion to the provisions of this clause, and no earlier than 15 days after the Commissioner of Insurance has received written notice of such proposed changes.

## 5.0   COMPLIANCE WITH POLICIES

### 5.1   Policies.

Physician agrees to accept and comply with Policies of which Physician knows or reasonably should have known (e.g., Clinical Policy Bulletins or other Policies made available to Participating Physicians). Physician will utilize the electronic real time HIPAA compliant transactions, including but not limited to, eligibility, precertification and claim status inquiry transactions. Company may at any time modify Policies. Company will provide ninety (90) days prior notice by letter, newsletter, electronic mail or other media, of Material Changes. If Physician objects to the Material Change, the Physician shall provide written notice to Company and may request that the Parties negotiate in good faith an appropriate amendment to this Agreement. If the parties are unable to negotiate any such amendment not more than thirty (30) days after receipt of a Material Change and Physician provides notice of termination of this Agreement not more than thirty (30) calendar days after receipt of a Material Change, then this Agreement shall terminate coincident with the effective date of the Material Change. In the event that Physician reasonably believes that a Material Change is likely to have a material adverse financial impact upon Physician's practice, Physician agrees to notify Company, specifying the specific bases demonstrating a likely material adverse financial impact, and the Parties will negotiate in good faith an appropriate amendment, if any, to this Agreement. If the parties are unable to negotiate any such amendment and Physician provides notice of termination of this Agreement not more than fifteen (15) calendar days after receipt of a Material Change, then this Agreement shall terminate coincident with the effective date of the Material Change. Physician agrees that noncompliance with any requirements of this Section 5.1 or any Policies will relieve Company or Plan Sponsors and Members from any financial liability for the applicable portion of the Physician Services. In addition, Physician shall participate in Company's preventive care program or implement an effective preventive care program consistent with Company's criteria and policies, for which Physician shall be compensated in accordance with the rates set forth in the Compensation Schedule.

### 5.2   Notices and Reporting.

To the extent neither prohibited by law nor violative of applicable privilege, Physician agrees to provide notice to Company, and shall provide all information reasonably requested by Company regarding the nature, circumstances, and disposition, of: (a) any litigation brought against Physician or any of its employees or affiliated providers which is related to the provision of health care services and could have a material impact on the Physician Services provided to Members; (b) comply with any Company requirements regarding reporting of self-referrals, loss of licensure or accreditation, and claims by governmental agencies or individual regarding fraud, abuse, self-referral, false claims, or kickbacks; and (c) any material change in services provided by Physician or licensure status related to these services. Physician agrees to use best efforts to provide Company with prior notice of, and in any event will provide notice as soon as reasonably practicable notice of, any actions taken by or against Physician described in this Section 5.2.

### 5.3   Information and Records.

5.3.1   Maintenance of Information and Records. Physician agrees (a) to maintain Information and Records (as such terms are defined in Section 5.3.2) in a current, detailed, organized and comprehensive

manner and in accordance with customary medical practice, applicable Federal and state laws, and accreditation standards; (b) that all Member medical records and Confidential Information shall be treated as confidential and in accordance with applicable laws; (c) to maintain such Information and Records for the longer of six (6) years after the last date Physician Services were provided to Member, or the period required by applicable law. This Section 5.3.1 shall survive the termination of this Agreement, regardless of the cause of the termination.

5.3.2 <u>Access to Information and Records</u>. Physician agrees that (a) Company (including Company's authorized designee) and Plan Sponsors shall have access to all data and information obtained, created or collected by Physician related to Members and necessary for the evaluation of and payment of claims, including without limitation Confidential Information ("Information"); (b) Company (including Company's authorized designee), Plan Sponsors and Federal, state, and local governmental authorities and their agents having jurisdiction, upon request, shall have access to all books, records and other papers (including, but not limited to, contracts, medical and financial records and physician incentive plan information) and information relating to this Agreement and to those services rendered by Physician to Members ("Records"); (c) consistent with the consents and authorizations required by Section 2.7 hereof, Company or its agents or designees shall have access to medical records for the purpose of assessing quality of care, conducting medical evaluations and audits, and performing utilization management functions; (d) as required by Texas law, Company conducts quality assessment through a panel of at least three (3) Participating Providers; (e) applicable Federal and state authorities and their agents shall have access to medical records for assessing the quality of care or investigating Member grievances or complaints; and (f) Members shall have access to their health information as required by 45 C.F.R. § 164.524 and applicable state law, be provided with an accounting of disclosures of information when and as required by 45 C.F.R. § 164.528 and applicable state law, and have the opportunity to amend or correct the information as required by 45 C.F.R. § 164.526 and applicable state law. Physician agrees to supply copies of Information and Records within fourteen (14) days of the receipt of a request, where practicable, and in no event later than the date required by any applicable law or regulatory authority. Subject to the provisions of this section as well as other provisions of this Agreement, Company confirms that, as between Company and Physician, Physician owns Physician's medical records. This Section 5.3.2 shall survive the termination of this Agreement, regardless of the cause of termination.

5.3.3 <u>Government Requirements Regarding Records for Medicare Members</u>. In addition to the requirements of Sections 5.3.1 and 5.3.2, with respect to Medicare Plans, Physician agrees to maintain Information and Records (as those terms are defined in Section 5.3) for the longer of: (i) ten (10) years from the end of the final contract period of any government contract of Company, (ii) the date the U.S. Department of Health and Human Services ("HHS"), the U.S. Comptroller General, or their designees complete an audit, or (iii) the period required by applicable laws, rules or regulations. Physician further agrees that, with respect to Medicare Plans, Company and Federal, state and local government authorities having jurisdiction, or their designees, upon request, shall have access to all Information and Records, and that this right of inspection, evaluation and audit of Information and Records shall continue for the longer of (i) ten (10) years from the end of the final contract period of any government contract of Company, (ii) the date HHS, the U.S. Comptroller General, or their designee complete an audit, or (iii) the period required by applicable laws, rules or regulations. This Section 5.3.3 shall survive the termination of this Agreement, regardless of the cause of termination.

5.4 <u>Quality, Accreditation and Review Activities</u>.
Physician agrees to cooperate with any Company quality activities or review of Company or a Plan conducted by the National Committee for Quality Assurance (NCQA) or a Federal or state agency with authority over Company and/or the Plan, as applicable.

5.5 <u>Proprietary Information</u>.

5.5.1 <u>Rights and Responsibilities</u>. Each Party agrees that the Proprietary Information of the other Party is the exclusive property of such Party and that each Party has no right, title or interest in the Proprietary Information. Each Party agrees to keep the Proprietary Information and this Agreement strictly

confidential and agrees not to disclose any Proprietary Information or the contents of this Agreement to any third party without the other Party's consent, except (i) to governmental authorities having jurisdiction, (ii) in the case of Company's disclosure to Members, Plan Sponsors, consultants or vendors under contract with Company, and (iii) in the case of Physicians' disclosure to Members for the purposes of advising Members of potential treatment options and costs. Except as otherwise required under applicable Federal or state law, each Party agrees to not use any Proprietary Information of the other Party, and at the request of the other Party to this Agreemen, return any Proprietary Information upon termination of this Agreement for whatever reason. Notwithstanding the foregoing, Physician is encouraged to discuss Company's provider payment methodology with patients, including descriptions of the methodology under which the Physician is paid. In addition, Physician may freely communicate with patients about their treatment options, regardless of benefit coverage limitations. This Section 5.5.1 shall survive the termination of this Agreement for one (1) year, regardless of the cause of termination.

## 6.0 TERM AND TERMINATION

Prior to termination initiated by Company and in accordance with applicable State law, Company shall provide a written explanation of the reason(s) for termination, and upon request before the effective date, Physician shall be entitled to a review by an advisory panel.

### 6.1 Term.

This Agreement shall be effective for an initial term ("Initial Term") of _one_ (1) year(s) from the Effective Date, and thereafter shall automatically continue for additional terms of one (1) year each, unless and until terminated in accordance with this Article 6.0.

### 6.2 Termination without Cause.

This Agreement may be terminated by either Party with at least ninety (90) days prior written notice to the other Party. In addition to the foregoing, Physician may terminate this Agreement in accordance with the provisions of Section 5.1.

### 6.3 Termination for Breach.

This Agreement may be terminated at any time by either Party upon at least ninety (90) days prior written notice of such termination to the other Party upon material default or substantial breach by the other Party of one or more of its obligations under this Agreement, unless such material default or substantial breach is cured within ninety (90) days of the notice of termination; provided, however, if such material default or substantial breach is incapable of being cured within such ninety (90) day period, any termination pursuant to this Section 6.3 will be ineffective for the period reasonably necessary to cure such breach if the breaching party has taken all steps reasonably capable of being performed within such ninety (90) day period. Notwithstanding the foregoing, the effective date of such termination may be extended pursuant to Section 6.6 of this Agreement.

### 6.4 Immediate Termination or Suspension.

Any of the following events shall result in the immediate termination or suspension of this Agreement by Company, upon notice to Physician, at Company's discretion at any time: (a) the suspension, withdrawal, expiration, revocation or non-renewal of any Federal, state or local license, certificate or other legal credential authorizing Physician to practice medicine; (b) a suspension or revocation of Physician's DEA certification or other right to prescribe controlled substances; (c) Physician's indictment, arrest or conviction of a felony or for any criminal charge related to or in any way impairing Physician's practice of medicine; (d) the loss or material limitation of Physician's insurance under Section 2.5 of this Agreement; (e) a determination by Company that Physician's continued participation in provider networks could result in harm to Members; (f) the debarment or suspension of Physician from participation in any governmental sponsored program, including, but not limited to, Medicare or Medicaid; (g) the listing of Physician in the HIPDB; (h) change of control of Physician's practice to an entity not acceptable to Company: (i) any false statement or material omission in the participation application and/or confidential information forms and all other requested information, as determined by Company in its sole discretion; or (j) any adverse action with respect to Physician's hospital staff privileges. To protect the interests of patients, including Members, Physician will

provide immediate notice to Company of any of the events described in this Section 6.4, including notification of impending bankruptcy.

6.5    Obligations Following Termination.

Following the effective date of any expiration or termination of this Agreement or any Plan, Physician and Company will cooperate as provided in this Section 6.5. This Section 6.5 shall survive the termination of this Agreement, regardless of the cause of termination.

6.5.1    Upon Termination. Upon expiration or termination of this Agreement for any reason, other than termination by Company in accordance with Section 6.4 above, Physician agrees to provide Physician Services at Company's discretion to: (a) any Member who is inpatient as of the effective date of termination until such Member's discharge or Company's orderly transition of such Member's care to another provider; and (b) any Member, upon request of such Member or the applicable Plan Sponsor, for one (1) calendar year.

Company shall reimburse Physician for Covered Services to any Member of special circumstance, such as a person who has a disability, acute condition, or life-threatening illness or is past the twenty-fourth week of pregnancy. "Special circumstances" means a condition such that Physician reasonably believes that discontinuing care by Physician could cause harm to the patient. The special circumstance shall be identified by Physician, who must request that the Member be permitted to continue treatment under Physician's care and agree not to seek payment from the patient of any amounts for which the Member would not be responsible if Physician were still a Participating Provider. This subsection does not extend the obligation of Company to reimburse the terminated Physician for ongoing treatment of a Member beyond the 90th day after the effective date of termination, or beyond nine months in the case of a Member who at the time of the termination has been diagnosed with a terminal illness, except that the obligation to reimburse a Member who at the time of the termination is past the 24th week of pregnancy, extends through delivery of the child, immediate postpartum care, and the follow-up checkup within the first six weeks of delivery.

The terms of this Agreement, including the Services and Compensation Schedule shall apply to all services under this Section 6.5.1.

6.5.2    Upon Insolvency or Cessation of Operations. If this Agreement terminates as a result of insolvency or cessation of operations of Company, and as to Members of HMOs that become insolvent or cease operations, then in addition to other obligations set forth in this Section 6.5, Physician shall continue to provide Physician Services to: (a) all Members for the period for which premium has been paid; and (b) Members confined as inpatients on the date of insolvency or other cessation of operations until medically appropriate discharge. This provision shall be construed to be for the benefit of Members. No modification of this provision shall be effective without the prior written approval of the applicable regulatory agencies.

6.5.3    Obligation to Cooperate. Upon notice of expiration or termination of this Agreement or of a Plan, Physician shall cooperate with Company and comply with Policies in the transfer of Members to other providers. Upon notice of termination of this Agreement or of a Plan, Physician, upon the direction of Company and in accordance with applicable state law, shall provide reasonable advance notice of the impending termination to Members currently under the treatment of Physician.

6.5.4    Obligation to Notify Members. Upon notice of termination of this Agreement or of a Plan, Company shall provide reasonable advance notice of the impending termination to Members of Plans currently under the treatment of Physician, or in the event of immediate termination, as soon as practicable after termination.

6.6    Obligations During Dispute Resolution Proceedings.

In the event of any dispute between the Parties in which a Party has provided notice of termination under Section 6.3 and the dispute is required to be resolved or is submitted for resolution under Article 8.0 below, the termination of this Agreement shall be stayed and the Parties shall continue to perform under the terms of this Agreement until the final resolution of the dispute.

## 7.0 RELATIONSHIP OF THE PARTIES

### 7.1 Independent Contractor Status.

The relationship between Company and Physician, as well as their respective employees and other agents, is that of independent contractors, and neither shall be considered an agent or representative of the other Party for any purpose, nor shall either hold itself out to be an agent or representative of the other for any purpose. Company and Physician will each be solely liable for its own activities and those of its employees and other agents, and neither Company nor Physician will be liable in any way for the activities of the other Party or the other Party's employees or other agents arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage. Physician acknowledges that all Member care and related decisions are the responsibility of Physician and that Policies do not dictate or control Physician's clinical decisions with respect to the care of Members. In particular, medical necessity decisions are for compensation purposes only, and do not direct or limit the advice or care which Physician can or should provide in Physician's sole medical judgment. Physician agrees to indemnify and hold harmless the Company from any and all claims, liabilities and third party causes of action arising out of the Physician's provision of care to Members. Notwithstanding anything else in this section or this Agreement to the contrary, nothing shall require Physician to indemnify and hold harmless Company from any and all claims, liabilities and third party causes of action arising out of the Company's administration of Plans. This provision shall survive the expiration or termination of this Agreement, regardless of the reason for termination.

### 7.2 Use of Name.

Physician consents to the use of Physician's name and other identifying and descriptive material in provider directories and in other materials and marketing literature of Company in all formats, including, but not limited to, electronic media. Physician may use Company's names, logos, trademarks or service marks in marketing materials or otherwise, upon receipt of Company's prior written consent, which Company shall not unreasonably withhold.

### 7.3 Interference with Contractual Relations.

Physician shall not engage in activities that will cause Company to lose existing or potential Members, including but not limited to: (a) advising Company customers, Plan Sponsors or other entities currently under contract with Company to cancel, or not renew said contracts; (b) impeding or otherwise interfering with negotiations which Company is conducting for the provision of health benefits or Plans; or (c) using or disclosing to any third party membership lists acquired during the term of this Agreement for the purpose of soliciting individuals who were or are Members or otherwise to compete with Company. Nothing in this Section 7.3 is intended or shall be deemed to restrict (i) any communication between Physician and a Member, or a party designated by a Member, determined by Physician to be necessary or appropriate for the diagnosis and care of the Member and otherwise in accordance with Section 5.5.1; or (ii) notification of participation status with other HMOs or insurers. This section shall continue to be in effect for a period of one (1) year after the expiration or termination of this Agreement.

## 8.0 DISPUTE RESOLUTION

### 8.1 Member Grievance Dispute Resolution.

Physician agrees to (a) cooperate with and participate in Company's applicable appeal, grievance and external review procedures (including, but not limited to, medical necessity appeals and expedited appeals procedures) for Members, (b) provide Company with the information necessary to resolve same, and (c) abide by decisions of the applicable appeals, grievance and review committees. As required by State law, Physician shall post in Physician's office a notice to Members on the process for resolving complaints with Company including the Department of Insurance toll-free telephone number for filing complaints. Company shall not terminate or refuse to renew this Agreement or otherwise retaliate against Physician because Physician reasonably filed a complaint or an appeal on behalf of a Member.

8.2   Physician Dispute Resolution.
Company shall provide an internal mechanism under which Physician may raise issues, concerns, controversies or claims regarding the obligations of the Parties under this Agreement. Physician shall exhaust this internal mechanism for any contractual disputes prior to instituting any arbitration or other permitted legal proceeding. Discussions and negotiations held pursuant to this Section 8.2 shall be treated as inadmissible compromise and settlement negotiations for purposes of applicable rules of evidence.

8.3   Arbitration.
Any controversy or claim arising out of or relating to this Agreement including the breach, termination, or validity of this Agreement, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). Except as modified by this Section 8.3, the arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent with the Federal Arbitration Act, 9 U.S.C. §§ 1-16 or that would produce a different result, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction of the claim or controversy at issue. Except as may be required by law or to the extent necessary in connection with a judicial challenge, or enforcement of an award, neither a party nor the arbitrator may disclose the existence, content, record or results of an arbitration. Fourteen (14) calendar days before the hearing, the parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) premarked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The arbitrator may award only monetary damages in accordance with this Agreement.

8.4   Arbitration Solely Between Parties; No Consolidation or Class Action.
Any arbitration or other proceeding related to a dispute arising under this Agreement shall be conducted solely between them. Neither Party shall request, nor consent to any request, that their dispute be joined or consolidated for any purpose, including without limitation any class action or similar procedural device, with any other proceeding between such Party and any third party.


9.0   MISCELLANEOUS

9.1   Amendments.
This Agreement constitutes the entire understanding of the Parties hereto and no changes, amendments or alterations shall be effective unless signed and agreed to by duly authorized representatives of both Parties, except as expressly provided herein. Notwithstanding the foregoing, at Company's discretion, Company may amend this Agreement upon written notice, by letter, newsletter, electronic mail or other media, to Physician to comply with applicable law or regulation, or any order or directive of any governmental agency.

9.2   Waiver.
The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of this Agreement. To be effective, all of these waivers must be in writing and signed by an authorized officer of the Party to be charged. Physician waives any claims or cause of action for fraud in the inducement or execution related to these waivers.

9.3   Governing Law.
Unless otherwise provided for, this Agreement shall be governed in all respects by the laws of the State of Texas which exist not only at the time of this Agreement, but also includes any recodification and amendments to existing law as well as the future enactment of any new statutes and regulations by the State of Texas. The effective date of any recodification, and amendments to existing law as well as the future enactment of any new statutes and regulations by the State of Texas is the date stated by the Legislature, unless the Legislature specifies that the effective date of any such change in law or regulation to be the renewal date of this Agreement.

9.4 Liability.
Notwithstanding Section 9.3, either Party's liability, if any, for damages to the other Party for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to the damaged Party's actual damages. Neither Party shall be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by the other Party.

9.5 Severability.
Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provision of this Agreement. Neither Party shall assert or claim that this Agreement or any provision hereof is void or voidable if such Party performs under this Agreement without prompt and timely written objection.

9.6 Successors; Assignment.
This Agreement relates solely to the provision of Physician Services by Physician and does not apply to any other organization which succeeds to Physician assets, by merger, acquisition or otherwise, or is an affiliate of Physician. Neither Party may assign its rights or delegate its duties and obligations under this Agreement without the prior written consent of the other Party, which consent may not be unreasonably withheld. Company may assign its rights or delegate its duties and obligations to an Affiliate or successor in interest so long as any such assignment or delegation will not have a material impact upon the rights, duties and obligations of Physician.

9.7 Headings.
The headings contained in this Agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

9.8 Notices.
Except for notices pursuant to sections 5.2, 6.0, 8.0, 9.1, 9.6, and 9.8, a Party may provide notices pursuant to this Agreement by electronic means if the Party receiving notice has a fax number, e-mail address, or both listed below.

Company fax number:      1-860-754-5465
Provider fax number:

Company e-mail addresses:  not applicable
Physician e-mail addresses:

All notices given pursuant to sections 5.2, 6.0, 8.0, 9.1, 9.6, and 9.8 shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by United States certified mail return receipt requested, to the addresses listed below. If a Party does not provide all other notices pursuant to this Agreement by electronic means, then the Party shall give all other notices by United States mail to the other Party's address listed below.

To Physician at:

And to Company at:

Aetna Health Inc.
Provider Contract Management
Network Operations – S.W. Region
Post Office Box 569440
Dallas, TX 75356-9440

Aetna Health Inc.
Provider Contract Management
Network Operations – S.W. Region
2777 Stemmons Freeway, #300
Dallas, TX 75207

A Party may add, change or delete its addresses for notice by electronic means, and may change its address for notice by delivery and United States mail, by notice in conformity with this section 9.8.

9.9 Remedies.
Notwithstanding Sections 8.3 and 9.3, the Parties agree that each has the right to seek any and all remedies at law or equity in the event of breach or threatened breach of Section(s) 5.5, 6.6 and 7.3.

9.10 Force Majeure.
If either Party shall be delayed or interrupted in the performance or completion of its obligations hereunder by any act, neglect or default of the other Party, or by an embargo, war, act of terror, riot, incendiary, fire, flood, earthquake, epidemic or other calamity, or other act of God or of the public enemy, governmental act (including, but not restricted to, any government priority, preference, requisition, allocation, interference, restraint or seizure, or the necessity of complying with any governmental order, directive, ruling or request) then the time of completion specified herein shall be extended for a period equivalent to the time lost as a result thereof. This Section 9.10 shall not apply to either Party's obligations to pay any amounts owing to the other Party, nor to any strike or labor dispute involving such Party or the other Party.

9.11 Non-Exclusivity.
This Agreement is not exclusive, and nothing herein shall preclude either Party from contracting with any other person or entity for any purpose. Company makes no representation or guarantee as to the number of Members who may select or be assigned to Physician.

9.12 Survival.
In addition to those provisions which by their terms survive expiration or termination of this Agreement (e.g. 4.3.2 and 5.3.1), Sections 1.0, 5.3.2, 5.5, 6.5, 7.3, 8.0 and 9.0 shall survive expiration or termination of this Agreement, regardless of the cause giving rise to expiration or termination of this Agreement.

9.13 Entire Agreement.
This Agreement, including the Product Participation Schedule, Participation Criteria Schedules, Services and Compensation Schedule, if applicable and any additional attached schedules, constitutes the complete and sole contract between the Parties regarding the subject matter described above and supersedes any and all prior or contemporaneous oral or written representations, communications, proposals or agreements not expressly included in this Agreement and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral representations, communications, proposals, agreements, prior course of dealings or discussions of the Parties. There are no oral agreements between the Parties. Physician represents that Physician has not relied on any data, financial analysis, reports, notes, proposals, conclusions or projections, whether made orally or in writing, made by Company or any of its representatives, agents, employees or advisors, in connection with negotiation, acceptance, execution or delivery of the Agreement by Physician.

9.14 Delegation.
To the extent Company delegates certain functions to Physician such delegation shall be governed by a separate delegation agreement which shall be subject to the applicable requirements of Texas Insurance Code, Chapter 1272.

**IN WITNESS WHEREOF,** the undersigned parties have executed this Agreement by their duly authorized officers, intending to be legally bound hereby.

PHYSICIAN

By: _____

Printed Name: Ifeolumipo Sofola, MD

Title: MD

Date: 01/29/09

COMPANY

By: _____

Printed Name: Joanne M. Beck

Title: Network Vice President

Date: 3-5-09

REIMBURSEMENT ADDRESS:

Outreach Diagnostic Clinic
P.O. Box 741126
Houston, Texas 77274-1126

MAIN TELEPHONE NUMBER: 713-651 0870

CHIEF EXECUTIVE OFFICER: _____

CHIEF FINANCIAL OFFICER: _____

BUSINESS OFFICE MANAGER: Jennifer Williams

FEDERAL TAX I.D. NUMBER: 26-1220016

# PRODUCT PARTICIPATION SCHEDULE

Participation under this Physician Agreement will include the Aetna Products indicated below. Compensation for these products will be according to the Services and Compensation Schedule attached to this Agreement.

- Gated Health Benefit Product – Commercial health benefit plan which contains a Primary Care Physician as a component of the Plan design regardless of whether (i) selection of a Primary Care Physician is mandatory or voluntary under the terms of the Plan; or, (ii) an individual Member has selected a Primary Care Physician. Gated Health Benefit Products include but are not limited to: *HMO, QPOS, Elect Choice, Managed Choice POS, Aetna Choice POS II, and Aetna Select.*

- Non-Gated Health Benefit Product – Commercial health benefit plan which does not allow for the designation and/or use of a Primary Care Physician in the administration of the benefit Plan. Non-Gated Health Benefit Products include but are not limited to: *Open Choice PPO and National Advantage.*

  *Many member ID cards include the National Advantage logo (NAP) in conjunction with Gated and non-Gated Health Benefit Products. In those circumstances the rate applicable to other product (not NAP) on the ID card will apply.*

- Government Programs – All plans offered by Company under any government contract serving Medicare, Medicaid and Children's Health Insurance Program beneficiaries. Government Programs include, but are not limited to: all Aetna Medicare Advantage HMO, PPO, POS and network-based private fee-for-service plans.

- Non-Health Benefit Products – Including but not limited to: *Aetna Workers' Comp Access.*

  *As of the effective date of this Agreement, and until such time the Parties amend the Agreement otherwise, Physician does not participate in the Aetna Workers' Comp Access product.*

## SPECIALIST PHYSICIAN
## SERVICES AND COMPENSATION SCHEDULE

### COMPENSATION:

Provider agrees to accept Aetna Market Fee Schedule (AMFS) as payment in full.

### SERVICES:

Specialist will provide services that are within the scope of and appropriate to the Specialist's license and certification to practice.

### COMPENSATION TERMS AND CONDITIONS:

#### Definitions

**"Aetna Market Fee Schedule"** (AMFS) – A fee schedule that is based upon the contracted location where service is performed. This fee schedule is updated annually.

#### General

a)  Rates are inclusive of any applicable Member Copayment, Coinsurance or Deductible. For procedures and/or services not specifically listed above, Provider agrees to accept then current AMFS as payment in full. Company will pay the lesser of the contracted rate or eligible billed charges.

#### Billing

b)  Specialist must designate the codes set forth in this Compensation Schedule when billing.

#### Coding

c)  Company utilizes nationally recognized coding structures including, but not limited to, Revenue Codes as described by the Uniform Billing Code, AMA Current Procedural Terminology (CPT4), CMS Common Procedure Coding System (HCPCS), Diagnosis Related Groups (DRG), ICD-9 Diagnosis and Procedure codes, National Drug Codes (NDC) and the American Society of Anesthesiologists (ASA) relative values for the basic coding, and description for the services provided. As changes are made to nationally recognized codes, Company will update internal systems to accommodate new codes. Such changes will only be made when there is no material change in the procedure itself. Until updates are complete, the procedure will be paid according to the standards and coding set for the prior period.

Company will comply and utilize nationally recognized coding structures as directed under applicable Federal laws and regulations, including, without limitation, the Health Insurance Portability and Accountability Act (HIPAA).

# SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

## I.  BUSINESS CRITERIA

### A.  Applicability

1.  These criteria shall apply to each applicant for participation and each Specialist Physician participating in Plans for the duration of the Agreement and shall be enforced at the sole discretion of Company.

2.  The applicant must be certified by a Board recognized by the American Board of Medical Specialties or the American Osteopathic Association, unless the applicant meets an exception under the Company's Policy.  All exceptions must be approved by the Aetna Medical Director or designee.

3.  If Specialist Physician is part of a group practice, all specialist physicians in the group must satisfy these Participation Criteria.  If any physician in the group does not satisfy these criteria, the group cannot participate.  If a solo practitioner, the Specialist must continue to satisfy the participation criteria through the duration of the agreement.

4.  Each applicant must fully complete the participation application form and execute a participation agreement with Company.  Each applicant and participating Specialist Physician shall periodically supply to Company all requested information, including the confidential information forms.

### B.  Office Standards

Each Specialist Physician's medical office must:

1.  Have a sign containing the names of all physicians practicing at the office.  The office sign must be visible when the office is open.

2.  Have a mechanism for notifying members if an Allied Health Professional (e.g., physicians assistant, advanced practice nurse, nurse practitioner, nurse midwife) may provide care.

3.  Be clean, presentable and have a professional appearance.

4.  Be readily accessible to all patients, including but not limited to its entrance, parking and bathroom facilities.

5.  Provide clean, properly equipped patient toilet and handwashing facilities.

6.  Have a waiting room sufficient to accommodate waiting patients.

7.  Have at least two (2) exam rooms which are clean, properly equipped and provide privacy for the patient.

8.  Have a no-smoking policy.

9.  Have an assistant in the office during scheduled hours.

10. Require a medical assistant to attend specialized (e.g., gynecological) examinations unless the patient declines to allow such assistant to be present.

11. Provide evidence that physician has a copy of current licenses for all Allied Health Professionals practicing in the office, including: state professional license, Federal Drug Enforcement Agency

and State Controlled Drug Substance (where applicable).

12. Keep on file and make available to Company any state required practice protocols or supervising agreements for Allied Health Professionals practicing in office.

13. Have appropriate equipment immediately available for the treatment of medical emergencies.

C. **Coverage**

1. When applicable to the relevant Specialty, as determined by Company at its sole discretion, Specialist Physician shall ensure that twenty-four (24) hours-a-day coverage for Members is arranged with another Company Participating Specialist Physician, except as otherwise provided in subsection 3 of this section.

2. For outpatient services, a covering physician's office must be geographically accessible and consistent with local community patterns of care to help ensure that a member is not required to travel more than thirty (30) minutes travel time from the member's regular physician's office to access the covering physician's services. However, longer travel times are permissible as long as they are based on location (such as a rural area) and/or are established and based on the routine patterns of care that can be obtained from the geographic area.

3. Inpatient coverage must be arranged with a Participating Physician who has privileges at the same hospital as the covering physician.

D. **Access**

1. Specialist Physician shall have a reliable twenty-four (24) hours, seven (7) days-a-week answering service or machine with a beeper or paging system. A recorded message or answering service which refers Members to the emergency room is not acceptable.

2. Specialist Physician shall make available at least an average of eight (8) hours a week for scheduling office appointments.

3. Specialist Physicians in Obstetrics and Gynecology shall make available at least an average of twenty (20) hours a week for scheduling office appointments.

4. For Aetna Workers' Comp Access (AWCA) when applicable, Specialist Physician shall schedule an initial visit and provide services within a reasonable period of time or, where applicable, within that period of time as required by workers compensation law.

E. **Sanctions**

1. Specialist Physician must not have been indicted, arrested for, charged with or convicted (e.g., finding of guilt by a judge or jury, a plea of guilty or nolo contendere, participation in a first offender program or any other such program which may be available as an alternative to proceeding with prosecution, whether or not the record has been closed or expunged) of a) any felony or b) any criminal charge related to, or in any way impairing, Specialist's practice of medicine.

2. A Specialist must have an unrestricted DEA certification, and where applicable, a state-mandated controlled drug certification.

3. A Specialist shall not be:
   (a) suspended or debarred from participation in the Medicare or Medicaid programs; or
   (b) sanctioned by the Department of Health and Human Services Office of the Inspector General (DHHS-OIG); or

(c) debarred by the Office of Personnel Management (OPM).

## II. PROFESSIONAL COMPETENCE AND CONDUCT CRITERIA

### A. Professional Liability Claims History

1. Specialist Physician must not have a history of professional liability claims, including, but not limited to, lawsuits, arbitration, mediation, settlements or judgments, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### B. History of Unprofessional Conduct/Unacceptable Business Practices

1. Specialist Physician must not have engaged in any unprofessional conduct, unacceptable business practices or any other act or omission which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### C. History of Involuntary Termination or Restrictions

1. Specialist Physician must not have a history of involuntary termination (or voluntary termination during or in anticipation of an investigation or dismissal) of employment or any other sort of engagement as a health care professional, reduction or restriction of duties or privileges, or of a contract to provide health care services, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### D. References

1. Each applicant for participation must supply references as requested by the applicable Company peer review committee.

2. The applicable Company peer review committee shall have the right to act on any reference or information received from a Specialist Physician's colleagues. Specialist Physician waives any and all rights to bring any legal action relating to such information or the collection or use thereof against Company, any Affiliates or related companies or any director, officer, employee or agent thereof, or any person or entity providing a reference or information at the request of the applicable Company peer review committee.

# Service and Billing Location Form

Listed below is each participating provider* with the corresponding physical location, billing address and telephone numbers:

*Upon written notice from Provider, Company may agree to add new or relocating facilities, locations or providers to existing Agreement upon completion of applicable credentialing and satisfaction of all other requirements of Company. Other demographic information may be revised upon written notice from Provider.

Provider Name: _Ifeolumipo O. Sofola_

| | Service Location Name | Billing Name | |
|---|---|---|---|
| | | Electronic Billing Name _(as it appears on the submission)_ | Outreach Diagnostic Clinic |
| Street | 2000 Crawford Street | Address | P.O. Box 741126 |
| Suite # | 900 | Suite # | |
| City | Houston | City | Houston |
| State, Zip | Texas 77002-9011 | State, Zip | Tx 77274-1126 |
| Phone # | 713 651 0870 | Phone # | 713-651-0840 532-73 |
| Fax # | 713-651-1239 | Fax # | 713-651-1239 866-261 |
| Email Address | | Email Address | 866-297-8970 |
| Tax ID# | 26-1220016 | NPI 1578631256 | NPI Type: Individual |

Company Use Only:   PIN# _7836045_     PVN# _6689140_

| | Service Location Name | Billing Name | |
|---|---|---|---|
| | | Electronic Billing Name _(as it appears on the submission)_ | Outreach Diagnostic Clinic |
| Street | 2000 Crawford Street | Address | P O.Box 741126 |
| Suite # | 800 | Suite # | |
| City | Houston | City | Houston |
| State, Zip | Texas 77002 | State, Zip | Texas 77002 |
| Phone # | 713-838-9153 | Phone # | 713-532-7311 |
| Fax # | 713-542-5574 | Fax # | 866-297-8970 |
| Email Address | | Email Address | |
| Tax ID# | 26-1220016 | NPI 1578631256 | NPI Type: Individual |

Company Use Only:   PIN# _7836045_     PVN# _6689140_

| | Service Location Name | Billing Name | |
|---|---|---|---|
| | | Electronic Billing Name _(as it appears on the submission)_ | |
| Street | | Address | |
| Suite # | | Suite # | |
| City | | City | |
| State, Zip | | State, Zip | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |
| Email Address | | Email Address | |
| Tax ID# | | NPI | NPI Type: |

Company Use Only:   PIN#_____     PVN#_____